ANDOVER SAVINGS BANK & others[1] *vs.* COMMISSIONER OF
REVENUE
(and a companion case[2]).

Suffolk.   May 6, 1982. — August 25, 1982.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Banks and Banking.   Taxation,* Bank excise tax.  *Constitutional Law,*
Taxation, Equal protection of laws, Interstate commerce.  *Adminis-
trative Law,* Exhaustion of remedies.

An action by representative savings banks and cooperative banks, seeking
a declaration that the bank excise tax imposed by G. L. c. 63, § 11, is
unconstitutional and illegally applied, raised important public ques-
tions and was appropriate for treatment by a court notwithstanding
the plaintiffs' failure to exhaust their administrative remedies.
[232-233]
The income-based portion of the bank excise tax imposed by G. L. c. 63,
§ 11 (a) (1) and (b) (1), meets the test of reasonableness prescribed by
the Massachusetts Constitution.  [233-236]
Amounts paid by savings banks and cooperative banks to their depositors,
including those holding certificates of deposit, were properly treated
by the Commissioner of Revenue as being analogous to dividends,
rather than operating expenses, and thus such amounts were not de-
ductible from gross income for purposes of calculating the income por-
tion of the bank excise tax imposed by G. L. c. 63, § 11. [236-239]
The Commissioner of Revenue did not err in continuing to apply the
deposits portion of the bank excise tax to State-chartered mutual sav-
ings banks and cooperative banks, following a Federal Circuit Court
decision that this aspect of the tax, as applied to Federal savings and
loan associations, violated Federal law, where it was clear that the
Legislature intended to continue to tax State-chartered institutions.
[239-241]

[1] First American Bank for Savings, Home Savings Bank, Mutual Bank
for Savings, The Provident Institution for Savings in the Town of Boston,
Worcester County Institution for Savings, and Savings Banks Association
of Massachusetts.

[2] Stoneham Co-operative Bank & another *vs.* Commissioner of Reve-
nue.  The other plaintiff is the Haverhill Co-operative Bank.

State-chartered savings banks and cooperative banks were not denied their constitutional right to equal protection of the laws by reason of the fact that the deposits portion of the bank excise tax established by G. L. c. 63, § 11, continued to be imposed upon them following a Federal Circuit Court decision that Federal law did not permit imposition of that portion of the tax on Federal savings and loan associations. [241-244]

In an action seeking relief from the bank excise tax imposed by G. L. c. 63, § 11, there was no merit in the contention that cooperative banks were denied equal protection of the laws because they were taxed differently from State-chartered commercial banks. [244]

Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution did not require excise taxes to be proportional in their effect on mutual banks and State-chartered commercial banks, as the respective privileges of the two classes of banks are different in character. [244-245]

Provisions of G. L. c. 63, § 11, which place a geographical limitation on mortgage loans which qualify for a deduction in calculating the deposits portion of the bank excise tax, did not impermissibly discriminate against interstate commerce, in view of circumstances that the statutory intent was merely to avoid double taxation of real estate, that the resulting burden on out-of-State borrowers was speculative and insubstantial, that banking activities are of "profound local concern," and that Congress has recognized the validity of geographical restrictions imposed by States upon mutual banks. [245-250]

CIVIL ACTIONS commenced in the Supreme Judicial Court for the county of Suffolk on December 18, 1981.

The cases were reported by *Liacos*, J.

*Laurence H. Tribe* (*Kenneth A. Cohen* with him) for Andover Savings Bank & others.

*Stanley V. Ragalevsky* (*Karen J. Bloom* with him) for Stoneham Co-operative Bank & another.

*Stephen S. Ostrach*, Assistant Attorney General (*Charles E. Walker*, Assistant Attorney General, with him) for Commissioner of Revenue.

*Donald J. Barry, Jr.*, for Massachusetts Mortgage Bankers Association, amicus curiae, submitted a brief.

*Peter W. Coogan & Scott C. Moriearty*, for Mutual Savings Central Fund, Inc., amicus curiae, submitted a brief.

*Theodore C. Landsmark*, for Massachusetts Urban Reinvestment Advisory Group, amicus curiae, submitted a brief.

*Thomas A. Brooks, F. Douglas Birdzell, W. Randolph Torres & Thomas W. Lawless, Jr.*, for Federal Deposit Insurance Corporation, amicus curiae, submitted a brief.

*Richard A. Manley*, for Massachusetts Taxpayers Foundation, Inc., amicus curiae, submitted a brief.

HENNESSEY, C.J. In this consolidated action filed in the county court, the plaintiffs, who are six savings banks, a savings banks association, and two cooperative banks, seek to have this court declare that the bank excise tax levied by G. L. c. 63, § 11,[3] is unconstitutional and also illegally applied by the Commissioner of Revenue.[4] See G. L. c. 231A.

---

[3] General Laws c. 63, § 11, as appearing in St. 1975, c. 684, § 44, provides in pertinent part: "Every savings bank as defined in chapter one hundred and sixty-eight, every co-operative bank as defined in chapter one hundred and seventy and every state or federal savings and loan association located in the commonwealth shall pay to the commissioner an annual excise equal to the following: (*a*) on or before the twenty-fifth day of the seventh month of the taxable year, there shall be paid (1) six hundred twenty-seven one thousandths percent of a reasonable estimate of its net operating income, as hereinafter defined, for the taxable year, and (2) one-sixteenth of one percent of the average amount of its deposits or of its savings accounts and share capital for the first six months of the taxable year, after deducting from such average amounts (*i*) its real estate used for banking purposes, valued at cost less reasonable depreciation, and (*ii*) the unpaid balance on its loans secured by the mortgage of real estate taxable in this commonwealth, or real estate situated in a state contiguous to the commonwealth, and within a radius of fifty miles of the main office of such bank or association, and in the case of a bank or association not previously subject to tax by the commonwealth the unpaid balances on such of its loans secured by the mortgage of real estate located outside of the commonwealth which are outstanding on March first, nineteen hundred and sixty-six, both as of the close of such six month period; and (*b*) [The first paragraph of subsection (*b*) is similar to subsection (*a*), except that the tax is to be paid after the close of the taxable year, and, with respect to the income-based portion of the tax, a different percentage is payable.]

"For the purpose of this section, 'net operating income' shall mean gross income from all sources, without exclusion, for the taxable year, less (*i*) operating expenses, (*ii*) net losses upon assets sold, exchanged or charged off as uncollectible during the taxable year, and (*iii*) minimum additions during the taxable years to its guaranty fund or surplus required by law or the appropriate federal and state supervisory authorities . . . ."

[4] The savings banks and the savings banks association also seek injunctive relief.

The case is before us on reservation and report by a single justice of this court, with an accompanying statement of agreed facts.[5] The plaintiffs make four claims: (1) that the excise is unreasonable and therefore in violation of Part II, c. 1, § 1, art. 4, of the Massachusetts Constitution; (2) that the Commissioner has incorrectly interpreted G. L. c. 63, § 11, so as to forbid the plaintiff banks to deduct as an "operating expense" the dividends or interest paid to depositors; (3) that § 11 is being discriminatorily applied contrary to the Massachusetts Constitution and the equal protection clause of the Fourteenth Amendment to the United States Constitution; and (4) that one aspect of § 11 impermissibly interferes with interstate commerce, and is therefore contrary to art. I, § 8, of the Constitution of the United States. We conclude that each of these claims is without merit and hold that the excise is constitutional.

1. As a preliminary matter, we note that the defendant does not argue that, because the plaintiffs have failed to exhaust their administrative remedies before the Appellate Tax Board, a declaratory judgment should be denied in this case. Where the Legislature has provided an administrative procedure for resolving certain types of controversies, the "requirement of exhaustion will be suspended only when the facts of a particular case raise important public questions whose resolution concerns or will affect more persons than the parties to the case." *East Chop Tennis Club* v. *Massachusetts Comm'n Against Discrimination*, 364 Mass. 444, 450 (1973). We agree that this case involves issues of law that affect every thrift institution chartered under the laws of this Commonwealth, and that this case is therefore an appropriate one with which to deal in a declaratory pro-

---

[5] Amicus curiae briefs were submitted by the Federal Deposit Insurance Corporation, the Massachusetts Mortgage Bankers Association, the Massachusetts Taxpayers Foundation, Inc., the Massachusetts Urban Reinvestment Advisory Group, and the Mutual Savings Central Fund, Inc.

ceeding. See *First Fed. Sav. & Loan Ass'n* v. *State Tax Comm'n*, 372 Mass. 478, 482 (1977), aff'd, 437 U.S. 255 (1978).[6]

2. The Constitution of the Commonwealth authorizes the General Court to impose "reasonable" excises on the privilege of transacting business as a corporation. Part II, c. 1, § 1, art. 4. See *S.S. White Dental Mfg. Co.* v. *Commonwealth*, 212 Mass. 35, 38 (1912) (constitutional reference to "commodities" includes the privilege of transacting business as a corporation), aff'd, 231 U.S. 68 (1913). See also *Commissioner of Revenue* v. *Massachusetts Mut. Life Ins. Co.*, 384 Mass. 607, 612-613 (1981). The cooperative banks[7] broadly attack G. L. c. 63, § 11, as unreasonable and therefore in violation of that constitutional limit on the legislative power. They do not appear to argue that the deposits portion of the excise, § 11 (*a*) (2) & (*b*) (2), is unreasonable, nor could they well do so in light of the well-reasoned decision upholding that aspect of the tax in *Commonwealth* v. *People's Five Cents Sav. Bank*, 5 Allen 428 (1862). See *Provident Inst.* v. *Massachusetts*, 73 U.S. (6 Wall.) 611 (1867), affirming *Commonwealth* v. *Provident Inst. for Sav.*, 12 Allen 312 (1866). Rather, the thrust of their argument is that the income-based portion of the excise tax, § 11 (*a*) (1) & (*b*) (1), is unreasonable as interpreted and applied by the Commissioner because it does not fairly measure the present existing value of the franchises of the banks. They point out that while the pretax profits of the banks have in recent years decreased, the amount of taxes assessed under § 11 has increased. In particular, it is argued that amounts paid as interest to depositors constitute a "cost" of doing business and therefore must be deducted from "net operating income" if the excise is to measure accurately the value of the privilege of conducting business as a corporation.

---

[6] We also note that although the tax rates set forth in G. L. c. 63, § 11, are less than one percent, the tax base is so broad as to make the issues presented in this case of considerable fiscal significance both to the Commonwealth and to the affected institutions.

[7] The savings banks have not challenged the excise tax as unreasonable.

The parties agree that the thrift industry in Massachusetts is currently experiencing severe financial difficulties. A major factor has been the rise of interest rates in recent years. It appears that, during the 1960's and 1970's, thrift institutions (also referred to as "mutual" institutions) invested their funds mostly in long-term, fixed-rate real estate loans at interest rates which, by today's standards, are relatively low. According to the agreed statement of facts, depositors at that time put their money primarily into regular savings accounts which yielded returns of approximately 4½% to 5½%. Because the banks were able to get average returns on their loans at higher rates than were paid to the depositors, they were able to operate on a sound financial basis. As interest rates rose in the late 1970's, however, these banks were forced to pay higher rates in order to continue attracting depositors. Many depositors withdrew their money from regular savings accounts and purchased term certificates of deposit which yielded returns at higher rates of 13% to 16%. The banks' investments in outstanding long-term loans have continued to yield returns at the relatively lower interest rates existing at the time they were made. Although total investment returns have increased in recent years, they have not kept up with the sharp increase in funds paid to depositors. Several of the plaintiffs have been unable in the last two years to earn sufficient income to cover the amount of these funds and overhead expenses.

The plaintiffs assert that this situation has been exacerbated by the Commissioner's interpretation of G. L. c. 63, § 11. Section 11, in addition to imposing a tax on deposits, also levies a tax on "net operating income" defined as gross income for the taxable year, less "operating expenses" and other deductions not relevant to this case. The Commissioner interprets "operating expenses" as not encompassing amounts paid to depositors in the form of interest or dividends. Without the deduction for amounts paid to depositors, the taxes assessed on the banks under § 11 have generally increased even though the banks have been experiencing significantly lower earnings, and even losses.

In addressing a constitutional challenge to a tax measure, we begin with the premise that the tax is endowed with a presumption of validity and is not to be found void unless its invalidity is established beyond a rational doubt. *Eaton, Crane & Pike Co.* v. *Commonwealth,* 237 Mass. 523, 527 (1921). *Commonwealth* v. *People's Five Cents Sav. Bank, supra* at 431-432. See *Johnson* v. *Martignetti,* 374 Mass. 784, 790-791 (1978). The Legislature is empowered to impose a reasonable excise on any franchise or privilege conferred by the Commonwealth. The limitation that an excise be "reasonable" was not intended to give to the judiciary the right to revise decisions of the Legislature that might be thought unwise or inexpedient. *Connecticut Mut. Life Ins. Co.* v. *Commonwealth,* 133 Mass. 161, 163 (1882). Nevertheless, the Legislature may not impose an excise tax which is based upon "false and unjust principles," *Commonwealth* v. *People's Five Cents Sav. Bank, supra* at 437, or which exacts assessments that are "grossly oppressive or contrary to common right," *American Uniform Co.* v. *Commonwealth,* 237 Mass. 42, 45 (1921), or which does not "show a proper proportion between the benefits received and the sum paid for the enjoyment of them," *Suffolk Sav. Bank for Seamen, petitioner,* 151 Mass. 103, 105 (1890).

These principles cannot be applied in a vacuum. The constitutionality of an excise must be judged in relation to the nature of the entity upon which it is imposed. Mutual banking institutions, which consist of savings banks, cooperative banks, and savings and loan associations, are nonprofit organizations established solely for the benefit of their depositors. Their original purpose was to encourage thrift and also to afford a method by which the profits and advantages arising from the use of large amounts of money could be enjoyed by persons of moderate means. *Commonwealth* v. *People's Five Cents Sav. Bank, supra* at 433. *Bank of Redemption* v. *Boston,* 125 U.S. 60, 68 (1888). In addition, they were "designed to make it easier for a person to borrow money to build, buy or repair a home and to make available a certain amount of capital for government and

public enterprise securities." Report of the Special Commission on Taxation, 1954 House Doc. No. 2626, at 13-14. This public purpose remains unchanged today. Unlike commercial banks (which consist of national banks, trust companies, and banking companies), mutual institutions are not owned by stockholders who have invested in the stock of the bank. Instead, savings banks are "owned" by their depositors, and cooperative banks and savings and loan associations are "owned" by member shareholders. *Id.* See generally G. L. c. 168 (savings banks); G. L. c. 170 (cooperative banks); 12 U.S.C. § 1464 (1976 & Supp. IV 1980) (Federal savings and loan associations). See also *Dunham* v. *Ware Sav. Bank*, 384 Mass. 63, 73 (1981).

In determining whether the excise imposed by § 11 fairly measures the value of the franchise, the plaintiffs would have this court think of "value" as something akin to what might be produced if a particular mutual bank were sold to private buyers. But the value of transacting business as a savings bank or cooperative bank lies not in any surplus that may be accumulated, but rather in the benefits that are enjoyed by the depositors and borrowers. See *Commonwealth* v. *People's Five Cents Sav. Bank*, 5 Allen 428, 437-438 (1862). We have no doubt that, viewed in this light, the income-based portion of the excise is reasonable. It is not a type of corporate income tax. It measures the value of the bank's investment function according to the returns that are realized for the benefit of its depositors. This is at least as reasonable a measure of the privilege as is the deposits tax, which measures the bank's investment function according to the total deposits available for investment. Greater precision in measuring the value of the privilege is not constitutionally required. *Commissioner of Revenue* v. *Massachusetts Mut. Life Ins. Co.*, 384 Mass. 607, 613 (1981). *Springfield Ins. Co.* v. *State Tax Comm'n*, 342 Mass. 505, 513 (1961).

3. The plaintiffs contend that the Commissioner has incorrectly interpreted § 11 by refusing to permit the plaintiffs to deduct, as "operating expenses," interest or dividends

paid to depositors. It is argued that the obligation of a savings bank or cooperative bank to its depositors constitutes a debt, and that any periodic payment to depositors should be equated with the payment of interest to a creditor, and thus represents an operating expense. We addressed a similar question in the context of federally-chartered savings and loan associations in *First Fed. Sav. & Loan Ass'n* v. *State Tax Comm'n*, 372 Mass. 478, 482-485 (1977), aff'd, 437 U.S. 255 (1978), and upheld the Commissioner's position. The court concluded that the relationship between a Federal savings and loan association and its members is more like an ownership status than a debtor-creditor relationship, and that therefore any payment is more analogous to a dividend than a payment of interest.

What we said earlier in this case disposes of the plaintiffs' contention that *First Federal* is distinguishable. The fact that the depositors of savings banks and cooperative banks do not share some of the attributes of ownership discussed in *First Federal, supra* at 483-484, does not alter the essential relationship that exists between these mutual banks and their depositors. In the case of savings banks, the earnings may be distributed to the depositors, G. L. c. 168, §§ 59-60B, and any undivided profits are credited to surplus accounts "to meet losses, contingencies and adjustments arising out of or incidental to the operation of [the bank's] business." G. L. c. 168, § 57, as appearing in St. 1980, c. 367, § 6. Accumulated surplus is held in reserve for the benefit of the depositors. *Dunham* v. *Ware Sav. Bank*, 384 Mass. 63, 73 (1981). If a savings bank is voluntarily dissolved, the debts of the bank are satisfied first, after which the remaining proceeds are distributed among the depositors. G. L. c. 168, § 71 (2), (4). These provisions are consistent with an ownership status. Cooperative banks are similar in many respects. See G. L. c. 170, §§ 31, 37, 37A, 38, 40; St. 1934, c. 73, §§ 2-6, as amended (Mass. Ann. Laws c. 170 App. [1977]). We recognize that, in practice, these features of the relationship between depositor and bank are of little significance to the average depositor. Government regulation of

the banking industry affects the rates that may be paid to depositors, and insures depositors against the risks of bank failure. Nevertheless, such regulation does not alter the essential purpose for which mutual banks are established. For certain other purposes it may be more convenient to view the relationship between depositor and bank as that of debtor-creditor. Cf. *Carpenter* v. *Suffolk Franklin Sav. Bank*, 362 Mass. 770, 776 (1973); *Laighton* v. *Brookline Trust Co.*, 225 Mass. 458 (1917); *Atwood* v. *Dumas*, 149 Mass. 167 (1889). For tax purposes, however, we think that there is ample support for the Commissioner's position that payments made to depositors are analogous to dividends and thus not deductible as "operating expenses." See *Dunham* v. *Ware Sav. Bank, supra* at 73; *Lewis* v. *Lynn Inst. for Sav.*, 148 Mass. 235 (1889); *Commonwealth* v. *People's Five Cents Sav. Bank*, 5 Allen 428 (1862).

The plaintiffs also argue that holders of certificates of deposit more clearly have debt rather than equity relationships with the banks. In support of this contention, they observe that the certificate of deposit relationship is regulated by a written agreement, and that the rate at which payments are to be made to the holder is fixed in advance by the agreement. These superficial similarities to a debtor-creditor relationship, however, should not be permitted to disguise or alter what has already been said about the nature and purpose of mutual banks. It must be kept in mind that the excise imposed by § 11 — both the deposits-based portion and the income-based portion — is intended to tax that function of mutual banks which works to the benefit of those who enjoy the banks' privileges. One measure of that function is the amount of investment returns distributed to those who invest their savings in the business of these banks. In order for the excise to be faithful to this purpose, it must be levied upon the returns payable to all investors, including holders of certificates of deposit. Even if we accept that the words "operating expenses" are ambiguous, the Commissioner's long-standing interpretation of this phrase, including her conclusion that holders of certificates

of deposit are to be treated the same as all other depositors, "is entitled to some weight in resolving the statutory ambiguity." *First Fed. Sav. & Loan Ass'n* v. *State Tax Comm'n*, 372 Mass. 478, 485 (1977). See *Metropolitan Property & Liab. Ins. Co.* v. *Commissioner of Ins.*, 382 Mass. 514, 523-524 (1981); *Rockland Mut. Ins. Co.* v. *Commissioner of Ins.*, 360 Mass. 667, 675 (1971). We think, therefore, that the Commissioner has not exceeded her authority in refusing to allow a deduction for payments made to holders of certificates of deposit.

4. We next consider the plaintiffs' argument that the Commissioner has erred in applying the deposits portion of the excise to the State-chartered mutual institutions but not to Federal savings and loan associations. Prior to 1966, § 11 did not impose any tax on Federal savings and loan associations. Statute 1966, c. 14, § 11, rewrote G. L. c. 63, § 11, to make it applicable to all mutual banks located in Massachusetts, including Federal savings and loan associations, and also to increase the taxes payable by the banks.[8] In 1973, however, the United States Court of Appeals for the First Circuit, in *United States* v. *State Tax Comm'n*, 481 F.2d 963 (1st Cir. 1973), held that the deposits aspect of § 11, as applied to Federal savings and loan associations, violated 12 U.S.C. § 1464 (h) (1976), and was therefore invalid to that extent.[9] Since the First Circuit decision, those

---

[8] Statute 1966, c. 14, § 11, added the income-based portion of the excise, § 11 (*a*) (1) & (*b*) (1), and reduced the rate of tax on the deposits from one-half of one percent to one-twentieth of one percent. The over-all result was an increase in the total tax burden on the banks.

[9] Federal statute 12 U.S.C. § 1464 (h) (1976) provides that "[n]o State, county, municipal, or local taxing authority shall impose any tax on such associations or their franchise, capital, reserves, surplus, loans, or income greater than that imposed by such authority on other similar local mutual or cooperative thrift and home financing institutions." The court in *United States* v. *State Tax Comm'n*, 481 F.2d 963 (1st Cir. 1973), found that the practical application of G. L. c. 63, § 11 (*a*) (2) (*ii*) & (*b*) (2) (*ii*), violated 12 U.S.C. § 1464 (h) (1976). Section 11 (*a*) (2) (*ii*) and (*b*) (2) (*ii*) permits a bank to deduct, in computing the deposits tax, the unpaid balances on loans secured by the mortgage of real estate located in the Commonwealth or in contiguous States and within 50 miles of the bank's

Federal associations have not paid the deposits-based measure of the tax, but have paid only the net operating income measure of the excise tax. The Commissioner has continued to impose the deposits-based portion of the excise tax on Massachusetts savings banks and cooperative banks.

The plaintiffs first argue that the primary purpose of § 11 is to tax Federal and State institutions equally, and that the Commissioner's application of the deposits tax to the plaintiffs and not to Federal savings and loan associations is therefore contrary to the legislative intent and constitutes an unconstitutional usurpation of the legislative function. It cannot be doubted that equality of treatment was intended when the Legislature enacted St. 1966, c. 14, § 11. It may even be argued that the primary purpose of the 1966 amendment to G. L. c. 63, § 11, was to equalize the tax treatment of Federal savings and loan associations and State mutual banks (although this is open to substantial doubt). However, we think it unrealistic to conclude that G. L. c. 63, § 11, taken as a whole, has as its *primary* object the equal treatment of Federal and State banks. Common sense indicates that, unless it clearly appears to the contrary, the foremost purpose of a tax measure is to raise revenues. In these circumstances, we do not believe that the Legislature, had it been faced with the question, would have wanted the deposits tax to be entirely voided rather than to be applied only to State banks.

Our conclusion on this point is reinforced by the fact that, two years after the decision in *United States* v. *State Tax Comm'n, supra,* the Legislature enacted St. 1975, c. 684, § 44, which struck out § 11 and inserted identical language, except for increases made in the rates of the excise. This reenactment of § 11 manifests a legislative intent to continue taxing the State banks. "[W]hen the same legislature, in

main office. Federal savings and loan associations located in Massachusetts invest a higher percentage of their funds than do State-chartered mutual banks in real estate mortgages outside of the area specified in § 11, and therefore would be entitled to fewer deductions than the State-chartered banks.

a later statute, use the terms of an earlier one which has received a judicial construction, that construction is to be given to the later statute. . . . For if it were intended to exclude any known construction of a previous statute, the legal presumption is, that its terms would be so changed as to effect that intention." *Matter of Jones*, 379 Mass. 826, 834 (1980), quoting from *Commonwealth* v. *Hartnett*, 3 Gray 450, 451 (1855). See *Lorillard* v. *Pons*, 434 U.S. 575, 580-581 (1978). Although this case does not involve a judicial "construction" of a statute, but rather a judicial modification dictated by constitutional law, the principle is the same. The Legislature is presumed to be aware of any effects that a judicial decision may have on the operation of a statute. Given the direct impact that the Federal court decision in *United States* v. *State Tax Comm'n* had on State revenues, it is unlikely that the Legislature was ignorant of the decision or of the Commissioner's response to it. Surely the Legislature would not have reenacted the tax if it had intended that State banks also be exempted from its provisions. The logical conclusion is that the Legislature in 1975 intended that § 11 remain in effect as to State-chartered banks, but at the higher rates set by the 1975 law.

The plaintiffs make the further argument that the failure to tax State-chartered mutual banks and Federal savings and loan associations alike violated the plaintiffs' right to equal protection of the laws. It is asserted that the business of Federal savings and loan associations is substantially similar to that of savings banks and cooperative banks incorporated in this Commonwealth, see *Springfield Inst. for Sav.* v. *Worcester Fed. Sav. & Loan Ass'n*, 329 Mass. 184, 185, cert. denied, 344 U.S. 884 (1952); *Commissioner of Corps. & Taxation* v. *Flaherty*, 306 Mass. 461 (1940), cert. denied, 312 U.S. 680 (1941), and that the classification made by the Commissioner's application of the statute is without any rational basis. We disagree.

When economic regulation is challenged as a violation of the equal protection clause, the traditional inquiry is "whether

the classification involved rationally furthers a legitimate State interest." *Blue Hills Cemetery, Inc.* v. *Board of Registration in Embalming & Funeral Directing,* 379 Mass. 368, 376 (1979), quoting from *Johnson* v. *Martignetti,* 374 Mass. 784, 791 (1978). The banks argue that, since Massachusetts has no legitimate purpose in classifying Federal savings and loan associations and State-chartered banks differently, the tax must be unconstitutional. See, e.g., *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health,* 348 Mass. 414 (1965); *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life,* 307 Mass. 408 (1940). However, we believe that the traditional equal protection analysis is not entirely applicable where the classification that is made is between an entity of the State, and an agency or instrumentality of the Federal government. The Federal structure of our national government itself implies that a State may draw a distinction between its own entities and similar Federal agencies or instrumentalities for no other reason than that they are the creations of the different sovereigns; provided, of course, that the classification does not run afoul of the supremacy clause of the United States Constitution.

Whether or not this is true as a general principle, there is no doubt that it is true with respect to State taxation of banks. In *Union Bank & Trust Co.* v. *Phelps,* 288 U.S. 181 (1933), a case similar to this one, the United States Supreme Court held that Alabama did not violate the equal protection clause of the Fourteenth Amendment by taxing the shares of certain State commercial banks but not the shares of national banks. The Court observed that a State has no power to tax a federally-chartered bank unless expressly authorized by Congress. *Id.* at 186, and cases cited. See *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316 (1819). The Court then stated: "This is enough to negative the idea that shares of National and State banks are essentially the same for purposes of taxation. . . . [National banks] are of a class wholly distinct from the property of ordinary corporations or individuals, and this fact cannot be disregarded by

the State. If the State sees fit to tax unrestricted property within her jurisdiction and to omit National Bank shares, the classification cannot be said to be arbitrary and wholly unreasonable — the basis of it is plain enough. It may be vastly more important for the State to omit National Bank shares and tax ordinary moneyed capital according to a plan not permissible in respect of National Bank shares rather than conform to the standard prescribed by Congress. There is nothing to indicate that Congress ever supposed that mere establishment of a National Bank within a State could upset the scheme for taxation, theretofore entirely proper, by producing conflict with the XIV Amendment. This view would subject the taxing power of the State to the will of Congress far beyond what is necessary for the protection of federal agencies." *Union Bank & Trust Co.* v. *Phelps, supra* at 186-187.

It is argued that the constitutional underpinnings of *Phelps* have been eroded by more recent decisions which suggest that the Federal principles espoused in *M'Culloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819), no longer require that national banks be immune from State taxation. See *First Agricultural Nat'l Bank* v. *State Tax Comm'n*, 353 Mass. 172, 177-193 (1967), reversed on other grounds, 392 U.S. 339 (1968); *United States* v. *New Mexico*, 455 U.S. 720 (1982). It is undisputed, however, that by virtue of the supremacy clause State taxation of national banks is prohibited unless congressionally authorized. *First Agricultural Nat'l Bank* v. *State Tax Comm'n*, 392 U.S. 339 (1968). Whether the immunity of national banks from State taxation is derived from the supremacy clause or from broader principles of federalism implicit in the Federal Constitution, the language of the *Phelps* case is equally applicable. The classification made by Congress is endowed with constitutional validity, and thus carries with it the necessary implication that the States may make the same classifica-

tion.[10]  The same reasoning holds true under our State Constitution.

The cooperative banks make a similar argument that their right to equal protection of the laws has been violated because mutual banks are taxed differently from State-chartered commercial banks.[11]  The contention clearly is without merit.  Mutual banks and commercial banks are different in their organizational structure and purpose, and they have been subject to different methods of taxation for over 150 years.  Report of the Special Commission on Taxation, 1954 House Doc. No. 2626, at 19-20, 29-32.  The Legislature could reasonably conclude that these differences warrant different tax treatment.  *Union Bank & Trust Co. v. Phelps, supra* at 185-186.  *Bank of Redemption* v. *Boston*, 125 U.S. 60, 68-69 (1888).

There is also a suggestion by the cooperative banks that under our State Constitution, Part II, c. 1, § 1, art. 4, an excise must be proportional in its effect on mutual banks and commercial banks.  This argument is also without merit.  Although an excise tax "must operate alike on all persons who exercise a particular employment or enjoy the same privilege or commodity," *Oliver* v. *Washington Mills*, 11

---

[10] This court's decision in *Commissioner of Corps. & Taxation* v. *Flaherty*, 306 Mass. 461 (1940), cert. denied, 312 U.S. 680 (1941), is not to the contrary.  There the court struck down as invalid a State income tax levied on dividends received from share accounts in Federal savings and loan associations but not on similar income received by shareholders of State-chartered cooperative banks.  We read that holding as being based upon the principle that, in our dual system of government, one sovereign may not impose a discriminatory tax that adversely affects the activities of the other.  This principle is distinct from the command of the Fourteenth Amendment that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  And so it must be, for if the equal protection clause were applicable to such cases, a State's ability to tax creatures of its own creation would depend largely on the extent to which Congress has allowed State taxation of similar federally-controlled entities.  See *Union Bank & Trust Co.* v. *Phelps*, 288 U.S. 181 (1933).  Such a result is abhorrent to the idea that the Federal and State governments should retain political freedom to operate within their respective spheres of sovereignty.

[11] The savings banks do not join in this argument.

Allen 268, 279-280 (1865), the principle does not apply where, as in the case of mutual banks and commercial banks, the privilege enjoyed is of a different character. That these privileges are different has already been demonstrated.

5. We turn next to the contention that one aspect of the deposits tax constitutes an impermissible discrimination against interstate commerce in violation of the commerce clause, art. 1, § 8, cl. 3 of the United States Constitution. Section 11 allows a bank, in computing the tax, to deduct from taxable deposits "the unpaid balance on its loans secured by the mortgage of real estate taxable in this commonwealth, or real estate situated in a state contiguous to the commonwealth, and within a radius of fifty miles of the main office of such bank or association." The banks assert that by setting a geographical limitation on mortgage loans which qualify for the deduction, the deposits tax discourages mutual banks from lending money in other States, thereby discriminating against interstate commerce.

Although the purpose of the deduction at issue here is not necessarily controlling in deciding whether there is a violation of the commerce clause, see *Philadelphia* v. *New Jersey*, 437 U.S. 617, 626-627 (1978), we note that the avowed statutory intent is to avoid double taxation of real estate, property owners being subject to local real estate taxation.[12] Originally, the deduction applied only to loans made in Massachusetts, because the State's mutual banks had no power to make loans outside the State. The deduction has never been accurately attuned to its purpose.[13] In

---

[12] The mortgage deduction is derived from § 8 of St. 1881, c. 304, entitled, "An Act relieving property from double taxation in certain cases." Its purpose was acknowledged in *Lexington Sav. Bank* v. *Commonwealth*, 252 Mass. 180, 182-183 (1925), and *Suffolk Sav. Bank, petitioner*, 149 Mass. 1, 4 (1889).

[13] Prior to 1966, the deduction was allowed for so much "as is invested in . . . [l]oans secured by mortgage of real estate taxable in this commonwealth." G. L. c. 63, § 12, repealed by St. 1966, c. 14, § 12. This permitted banks to deduct the amount originally invested in the partic-

1946, the savings banks were permitted to make loans in contiguous States upon real estate located within twenty-five miles of a bank's main office. St. 1946, c. 256, § 1. The geographical limit was extended to fifty miles by St. 1955, c. 432, § 1 (amending G. L. c. 168, § 34, par. 2). Cooperative banks were permitted in 1950 to make contiguous-States loans within twenty-five miles, St. 1950, c. 371, § 1 (amending G. L. c. 170, § 23), and in 1974 the limit was extended to fifty miles. St. 1974, c. 100. The deduction, however, was not extended to the present fifty-mile limit until 1966. See St. 1966, c. 14, §§ 11, 12. Even then the deduction was not made available with respect to certain loans that were permitted beyond the geographical limits, i.e., real estate loans insured by the Federal Housing Administration or the Veterans' Administration. See G. L. c. 168, § 35, par. 11, as appearing in St. 1955, c. 432, § 1 (savings banks); G. L. c. 170, § 24A, inserted by St. 1959, c. 342 (cooperative banks). Although the deduction has remained the same since 1966, the geographical limitations on loans made by savings banks have been further relaxed in recent years. See G. L. c. 168, § 35, par. 11, as appearing in St. 1979, c. 629, § 2.[14]

---

ular asset held, rather than in the actual value of the investment, thus permitting investments to escape taxation altogether. See Report of the Special Commission on Taxation, 1954 House Doc. No. 2626, at 56-57. This defect was remedied in 1966 by changing the language to permit a deduction for "the unpaid balances on its loans." St. 1966, c. 14, § 11.

[14] Massachusetts savings banks are now empowered to make conventional mortgage loans outside of Massachusetts, and not within a contiguous State and within fifty miles of their main offices, up to a limit of 10% of the bank's deposits, so long as they are also continuing to lend in Massachusetts. G. L. c. 168, § 35, par. 11, as appearing in St. 1979, c. 629, § 2. Including Veterans' Administration and Federal Housing Administration mortgage loans, a Massachusetts savings bank may now make loans beyond the above geographical limits, up to a limit of 27.5% of its deposits or the aggregate book value of its real estate loans within Massachusetts and in contiguous States within fifty miles from its main office, whichever is less.

The geographical limitations placed on cooperative banks have undergone little change since 1959. See G. L. c. 170, §§ 23, 24A.

We assume for the purposes of this case that G. L. c. 63, § 11, discourages mutual banks from investing in mortgage loans outside the fifty-mile limit. If we were to accept the banks' reasoning that a State may not discourage mutual banks incorporated under its laws from investing in such loans, then surely it would follow that a State may not prohibit such investments altogether. Yet historically, State banks have never had the right to exercise their corporate powers outside of their home State unless expressly authorized by law. See 4 Michie, Banks and Banking c. 7, § 3 (1971). See also *Bank of Augusta* v. *Earle,* 38 U.S. (13 Pet.) 519, 587-588 (1839). Geographical restrictions of the type imposed by Massachusetts are common among the eastern States, see Encyclopedia of Banking Laws (H. Bailey, ed. 1964), and undoubtedly have existed since the early days of the mutual banking industry. Although the banks do not expressly so argue, their reasoning amounts essentially to a claim that all such geographical restrictions are invalid as a violation of the commerce clause.

We disagree that § 11, as well as the other geographical restrictions placed on Massachusetts mutual institutions, constitutes the type of "simple economic protectionism" that evokes "a virtually *per se* rule of invalidity" under the commerce clause. *Philadelphia* v. *New Jersey,* 437 U.S. 617, 624 (1978). It is true that the restrictions discriminate between mortgage loans made within Massachusetts and those made outside the State and beyond the fifty-mile limit. Nevertheless, we do not think that they fall within that class of cases relied on by the plaintiffs. The cases cited by the banks can be categorized as holding either (1) that a State may not block the flow of natural resources or products of trade from one State to another in order to satisfy local needs, e.g., *New England Power Co.* v. *New Hampshire,* 455 U.S. 331 (1982); *Hughes* v. *Oklahoma,* 441 U.S. 322 (1979); *Philadelphia* v. *New Jersey,* 437 U.S. 617 (1978), or (2) that a State may not impose a greater burden on out-of-State businesses to the direct advantage of local interests, e.g., *Maryland* v. *Louisiana,* 451 U.S. 725 (1981);

*Lewis* v. *BT Inv. Managers, Inc.,* 447 U.S. 27 (1980); *Phil-adelphia* v. *New Jersey,* 437 U.S. 617 (1978); *Boston Stock Exch.* v. *State Tax Comm'n,* 429 U.S. 318 (1977).

We first reject any suggestion that Massachusetts is blocking the flow of its natural resources or products of trade to other States. If the flow of anything is being inhibited, it is money that would otherwise be destined for out-of-State borrowers. Money is a medium of exchange and not a natural resource or product of trade. Moreover, there is no general interference with the interstate flow of money. Compare *Hughes* v. *Oklahoma,* 441 U.S. 322 (1979) (holding invalid a State law prohibiting the export for sale of natural minnows procured within the State). Here, only one means of exchange out of countless others is being restricted.

Nor do we find applicable those cases invalidating State laws which effect "simple economic protectionism." *Philadelphia* v. *New Jersey,* 437 U.S. 617, 624 (1978). If the deposits tax favors local interests at the expense of out-of-State interests, it does so only by discouraging certain out-of-State borrowers from doing business with Massachusetts mutual banks on a fully competitive basis. (Certainly foreign banks are not burdened by the operation of the tax.) Any such burden on out-of-State borrowers, we think, is too speculative to evoke the prohibitions of the commerce clause. The deposits tax is only one-sixteenth of one percent of the average amount of a bank's deposits. We cannot assume that this will significantly discourage Massachusetts mutual banks from competing in other States, or that any such decline in competition would necessarily affect the availability or price of real estate mortgages. It is just as likely that foreign banking institutions fully compensate for any lack of competition engendered by Massachusetts' regulatory policies.

But even if we were to assume that the tax has a meaningful impact on the market for real estate loans in other States, it would not follow that it is invalid. We think that a State may create a certain class of corporations and limit their ac-

tivities to intrastate transactions without violating the commerce clause. There is no inherent right to conduct business as a corporation. It is a privilege which may be granted or withheld by the State, and may be made subject to such terms and restrictions as the State deems appropriate. So long as no significant discriminatory burden is placed on foreign businesses in their conduct of interstate trade, and so long as the interstate flow of natural resources or products of trade is not obstructed, we think that a State may restrict a class of domestic corporations to the transacting of intrastate business in order to ensure that the citizens of the State will be the primary beneficiaries of the grant of the privilege. Banking activities are "of profound local concern," *Lewis* v. *BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980), and the impact of the challenged tax law is not "'parochial' in the sense that it overtly prevents foreign enterprises from competing in local markets." *Id.* at 39.

We also observe that Congress itself has recognized the validity of geographical restrictions imposed on mutual banks. There is of course no doubt that Congress has the power to "permit the states to regulate the commerce in a manner which would otherwise not be permissible." *Southern Pac. Co.* v. *Arizona*, 325 U.S. 761, 769 (1945). The Home Owners' Loan Act, 12 U.S.C. §§ 1461-1468 (1976 & Supp. IV 1980), which authorizes the organization of Federal savings and loan associations, provides that "[a]n association which was formerly organized as a savings bank under State law shall be subject to the requirements of State law . . . pertaining to discrimination in the extension of home mortgage loans or adjustment in the terms of mortgage instruments based on neighborhood or geographical area . . . if the [Federal Home Loan Bank] Board determines that State law and regulations impose more stringent requirements than Federal law and regulations." 12 U.S.C. § 1464 (a)(1) (Supp. IV 1980). It is unlikely that Congress would have required that banks be subject to State geographical limitations unless it considered such restrictions to be valid. It is also noteworthy that Massachusetts'

regulatory policy is consistent with a similar congressional policy expressed in the Community Reinvestment Act of 1977, 12 U.S.C. §§ 2901-2905 (Supp. IV 1980). The act directs "each appropriate Federal financial supervisory agency to use its authority when examining [regulated] financial institutions, to encourage such institutions to help meet the credit needs of the local communities in which they are chartered." 12 U.S.C. § 2901 (b). Federal banking authorities have issued regulations in furtherance of this purpose. See 12 C.F.R. § 25 (1982), 12 C.F.R. § 228 (1981), and 12 C.F.R. § 345 (1982). In addition, Federal savings and loan associations are also restricted to making commercial, corporate, and business loans only "within the State where the bank is located or within 75 miles of the bank's home office." 12 U.S.C. § 1464 (a)(2)(B) (Supp. IV 1980). These Federal laws exhibit an understanding on the part of Congress that geographical restrictions of the sort imposed by Massachusetts are valid and even desirable regulatory policy.

In sum, we conlude that § 11 does not impermissibly discriminate against interstate commerce. The commerce clause was intended to create "an area of trade free from interference by the States." *Boston Stock Exch.* v. *State Tax Comm'n,* 429 U.S. 318, 328 (1977), quoting from *Freeman* v. *Hewit,* 329 U.S. 249, 252 (1946). It was not intended, we think, to preclude the States from placing geographical restrictions on the activities of domestically-chartered mutual banking institutions.

6. We conclude our discussion by stating generally that, if the plaintiffs are to get relief from fiscal difficulties in what are concededly hard economic times, they should seek that relief from the Legislature. It is not within the province of this court to invalidate a tax merely because it has come to seem burdensome in recent years due to changed economic conditions. Banking is a heavily regulated industry, and the ills that now beset thrift institutions appear to be the result of a complex array of regulatory and eco-

nomic factors. If a cure is to be had for these ills, it should be accomplished by legislative action.

Judgment is to be entered denying injunctive relief and declaring that G. L. c. 63, § 11, is constitutional as applied to the plaintiffs, and that the Commissioner has not exceeded her authority in construing "operating expenses" not to include payments made in the form of interest or dividends to depositors or holders of certificates of deposit.

*So ordered.*