BRIAN ROCHE & another[1] vs. DIRECTOR OF THE DIVISION OF
MARINE FISHERIES.

No. 09-P-447.

Plymouth. December 8, 2009. - May 18, 2010.

Present: BERRY, BROWN, & SIKORA, JJ.

*Fisheries. Federal Preemption. Constitutional Law,* Federal preemption, Com-
merce clause, Equal protection of laws. *Regulation. Administrative Law,*
Regulations.

In an action brought by commercial fishers (plaintiffs) claiming that a State
regulation, 322 Code Mass. Regs. § 7.01(4)(a) (2006), promulgated by the
defendant, the director of the division of marine fisheries, impermissibly
limited their rights to fish in State waters, the judge, in granting summary
judgment in favor of the defendant, correctly ruled that the relevant Federal
act, 16 U.S.C. §§ 1801 et seq., did not preempt the State regulation, where
it was abundantly clear that the regulation, which obligated the plaintiffs to
choose to fish in State waters under either their Federal permits or their
State permits and obey the respective conservation limits imposed, posed
no obstacle to the conservation and management purposes of the Federal
act [736-738]; further, the regulation, which eliminated a loophole between
the State and Federal permitting schemes that was being used by fishers to
exceed the fishing limits in State waters, did not interfere with interstate
commerce [738-739], did not deny the plaintiffs equal protection under the
Fourteenth Amendment to the United States Constitution [739-740], and
was neither arbitrary, capricious, nor in excess of the defendant's statutory
authority [740].

CIVIL ACTION commenced in the Superior Court Department on
May 23, 2006.

The case was heard by *Richard F. Connon,* J., on motions for
summary judgment.

*Stephen M. Ouellette* for the plaintiffs.

*Maryanne Reynolds,* Assistant Attorney General, for the
defendant.

BROWN, J. The plaintiffs, Brian Roche and Douglas Marcella,

---

[1]Douglas Marcella.

are commercial fishers who claim that a State regulation promulgated by the defendant, the director of the division of marine fisheries (DMF) impermissibly limits their rights to fish in State waters because they hold Federal as well as State permits. Under the regulation, 322 Code Mass. Regs. § 7.01(4)(a) (2006), the plaintiffs are allowed to fish in State waters, but only in accordance with their Federal permits, unless they surrender those permits and fish in accordance with their State permits. Prior to adoption of the challenged regulation, the plaintiffs avoided Federal restrictions on their fishing activities by postponing the annual renewal of their Federal permits and, in the interim, fishing in State waters under their State permits. To alleviate concerns shared by Federal and State officials that this loophole between the renewal requirements of the Federal and State permitting programs was contributing to overfishing in Massachusetts waters, the challenged regulation ended the practice, and requires the plaintiffs to fish under one permit or the other.

The plaintiffs challenged the State regulation as unconstitutional, and as illegal, arbitrary, and capricious under G. L. c. 30A. A Superior Court judge ordered that summary judgment enter for the defendant, and the plaintiffs appealed. We affirm.

We summarize the undisputed facts from the summary judgment record. Fishing in Massachusetts coastal waters is regulated by the DMF, in cooperation with the National Marine Fisheries Service (NMFS). State and Federal fishing permits are issued by these agencies, respectively, and are renewed annually. State permits are issued according to the calendar year, while Federal permits are issued according to the "fishing year," which runs from May 1 to April 30. State fishing permits promote conservation by limiting the quantities of fish taken per year, while Federal fishing permits do so by limiting the number of days the permitted vessel is allowed to fish per year (referred to as "days at sea," or DAS). Days at sea that are allocated under a Federal permit may be used to fish in either State or Federal waters.

The plaintiffs held both State and Federal fishing permits. To fish under their State fishing permits, the plaintiffs obtained an authorization, referred to as a "groundfish endorsement," to take multispecies groundfish from Massachusetts waters. In addition, the plaintiffs held Federal fishing permits. Under the

Federal permitting scheme, permit holders are required to abide by Federal fishing regulations regardless of whether they are fishing in State or Federal waters. The plaintiffs avoided those restrictions, however, by delaying the renewal of their Federal permits each year,[2] instead utilizing their State permits to fish in State waters, in accordance with State quotas for amounts of fish taken. In this manner, the plaintiffs were able to fish in State waters without using their allotted days at sea under their Federal permits. When they then renewed their Federal permits, they received the full allotment of their days at sea, which they used to fish for the remainder of the fishing year. In 2005, Federal officials identified this practice as contributing to a significant increase in fish taken in Massachusetts coastal waters.[3]

In response to a request by Federal officials, the DMF adopted in December of 2005, an emergency regulation to close the loophole between the State and the Federal fishing permit programs, whereby certain fishers holding both State and Federal permits delayed renewing their Federal permits in order to fish beyond the limits imposed under either permitting scheme. The new State regulation provided that the groundfish endorsement would not be given to State permit holders who also held Federal permits, unless they permanently surrendered their Federal permits. This meant, in essence, that Federal permit holders still could fish in State waters, but only in accordance with their Federal permits, using their allotted days at sea. Federal permit holders were denied the requisite endorsement to fish under their State permits so long as they retained the right to renew their Federal permits. On March 10, 2006, the emergency regulation became permanent. See 322 Code Mass. Regs. § 7.01(4)(a).[4]

In February of 2006, the plaintiffs were denied groundfish

---

[2]Federal regulations, at the time of the plaintiffs' complaint, allowed limited access permit holders like the plaintiffs to delay renewal of their permits until almost the end of the fishing year.

[3]According to the NMFS: "Under current Federal regulations, a DAS vessel could increase its overall effort by fishing in state waters outside of the DAS program prior to renewal of its Federal DAS permit. Although it is estimated that less than 10 percent of federally permitted vessels currently exploit this inadvertent exception to Federal regulations, there is concern that this practice could expand, especially should further reductions in DAS be necessary."

[4]Subsection (4)(a)(2) of 322 Code Mass. Regs. § 7.01 provides, in relevant

endorsements to fish under their State permits, pursuant to the new regulation, because they chose not to surrender their Federal permits. They filed this action on May 23, 2006. On August 3, 2007, the NMFS adopted a new regulation to close the loophole in its Federal permitting regulations by prohibiting Federal permit holders from taking any fish from Federal or State waters until they renewed their Federal permits, and any Federal permit previously held needed to be renewed within one year or it would be canceled. This eliminated the plaintiffs' practice of delaying renewal of their Federal permits while they fished under their State permits.[5] The plaintiffs continued to press their claims against the DMF, however, seeking judgment in their favor on the challenged regulation, and attorney's fees and costs pursuant to 42 U.S.C. § 1983.

1. *Preemption.* We turn, first, to the plaintiffs' argument that the State regulation is preempted by the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson Act), 16 U.S.C. §§ 1801 et seq. The Magnuson Act, when enacted in 1976, "was an elaborate and path-breaking legislative enterprise intended to protect the American fishing industry, and to preserve endangered stocks of fish, from what were perceived to be predatory incursions by foreign fishing fleets into American waters." *Davrod Corp.* v. *Coates,* 971 F.2d 778, 785 (1st Cir. 1992). "The purpose of this historic act was to provide for the conservation and management of important fishery resources found off the coasts of the United States." *Ibid.,* quoting from

part: "The Director may issue a single State Waters Multispecies Groundfish Endorsement to permit holders who held a state-issued commercial permit on November 4, 2004, renewed their permit in 2005, and are not authorized by a federal permit to take Multispecies Groundfish or monkfish."

Subsection (4)(a)(3)(b) of 322 Code Mass. Regs. § 7.01 provides, in relevant part: "Notwithstanding permit prohibitions on eligibility described in 322 CMR 7.01(4)(a), the Director may issue a single State Waters Multispecies Groundfish Endorsement to a state-issued commercial permit holder for a vessel that has been authorized by a federal permit to take Multispecies groundfish or monkfish if the permit holder has surrendered said federal permit to NOAA Fisheries."

[5]The background section to the new Federal regulation explained: "It was never the intention of the regulations to allow a vessel to participate wholly in a state fishing program, in which it would not otherwise be allowed to participate under the conditions of the Federal limited access permit program for which it was eligible, while the vessel's Federal limited access permits were suspended."

128 Cong. Rec. 31695 (1982). To this end, the Magnuson Act established a 197-mile conservation zone, beyond the three-mile coastal waters, and developed planning to identify "the optimum yield which could be harvested annually, the U.S. harvest, the total allowable level of foreign fishing, and the management rules governing foreign and domestic harvests." *Davrod Corp.*, *supra.* The Magnuson Act includes provisions governing Federal fishing permits.

The Magnuson Act expressly provided for the State's regulatory authority over Massachusetts coastal waters, including the three-mile stretch between the coast and Federally protected waters. See *id.* at 786 ("[T]he Magnuson Act, as amended in 1983, does not preempt the Commonwealth's regulatory authority with respect to Massachusetts' off-shore waters; to the contrary, section 1856(a), as amended, expressly confirms that regulatory authority"). Nevertheless, the plaintiffs maintain that by implementing a Federal permitting scheme, the Magnuson Act implicitly prohibited States from limiting the rights of Federal permit holders to fish in State waters.

Preemption may be implied where it is "impossible for a private party to comply with both state and federal requirements," or "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Spreitsma* v. *Mercury Marine*, 537 U.S. 51, 64 (2002), quoting from *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287 (1995). See *Sawash* v. *Suburban Welders Supply Co.*, 407 Mass. 311, 314 (1990). The plaintiffs argue that because the regulation prevents them from fishing under both their Federal and their State permits, the regulation makes it physically impossible for them to comply with both Federal and State law. We discern no incompatibility with the Magnuson Act in the regulation restricting the amount of fish caught by the plaintiffs to the number of days at sea imposed by their Federal permits, so long as they choose to maintain the right to renew those permits. The plaintiffs are not foreclosed from fishing in State waters because of their Federal permits. The regulation requires that they choose to fish in State waters under their Federal permits or their State permits, and obey the respective conservation limits imposed; they no longer could exceed the quotas imposed under either scheme by fishing under both. Indeed, in our view, the chal-

lenged regulation closed the loophole that had rendered the State and Federal schemes incompatible in achieving their conservation and management objectives.[6]

The plaintiffs' argument is off the mark, as it is abundantly clear that the regulation poses no obstacle to the purpose of the Magnuson Act. We agree with the motion judge's observation that the purpose of the Magnuson Act was not to maximize fish taking, but to provide conservation and management of fishery resources that were endangered by overfishing. See *Davrod Corp.*, 971 F.2d at 785. See also *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries*, 380 Mass. 471, 478-479 (1980) (preemption by Magnuson Act of regulation limiting seine fishing was unlikely where prevention of overfishing was within State's police power). In short, the plaintiffs have not provided us with anything that would cause us to conclude otherwise.

2. *Dormant commerce clause.* The plaintiffs complain that the regulation discriminates against Federal permit holders by expressly excluding them from receiving a groundfish endorsement on their State permits that is available to State permit holders who do not have Federal permits. They argue that, in this manner, the regulation shuts off State fisheries from federally permitted fishers, thereby interfering with interstate commerce.

The dormant commerce clause has been interpreted to limit the authority of a State to impose regulations that impinge on interstate or foreign commerce. *West Lynn Creamery, Inc.* v. *Healy*, 512 U.S. 186, 192-193 (1994). A State may not "block the flow of natural resources or products of trade from one State to another in order to satisfy local needs." *Andover Sav. Bank* v. *Commissioner of Rev.*, 387 Mass. 229, 247 (1982), citing, e.g., *New England Power Co.* v. *New Hampshire*, 455 U.S. 331 (1982). See generally *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 209-218 (1824). Nor is a State permitted to aid local businesses or inhibit foreign companies operating within the State.

_____

[6]According to the NMFS: "State and Federal [fishery management plans] governing fisheries for the same species may differ in reporting requirements, participation restrictions, and overall strategies to control fishing mortality. These programs may be successful in achieving their objectives only when a vessel fishes in one program, either state of Federal, for an entire permit year, because the management measures are typically based on analyses of fishing effort, and where that effort is expected to take place."

See *Aloha Freightways, Inc.* v. *Commissioner of Rev.*, 428 Mass. 418, 428 (1998).

The plaintiffs maintain that the regulation favors fishers with State permits over fishers with Federal permits by closing off State fisheries to Federal permit holders. The record is clear, however, that the regulation does not deprive Federal permit holders of the right to fish in State waters. Rather, the regulation allows them to fish in State waters, but in accordance with the fishing limits imposed by their Federal permits. As a consequence, the regulation did eliminate the plaintiffs' opportunity to use both State and Federal permits to exceed the fishing limits in State waters imposed on those who held only State permits. We do not view that result as impermissibly favoring State permit holders over Federal permit holders, or inhibiting the latter from operating within the State. See *ibid.* Moreover, given the nondiscriminatory goal of the new regulation, we think that limiting the plaintiffs to either the State or the Federal fishing programs, and its respective quota, as a remedy for overfishing, was a legitimate use of State police power to conserve resources. See *Douglas* v. *Seacoast Prod., Inc.*, 431 U.S. 265, 277 (1977) ("States may impose upon federal licensees reasonable, nondiscriminatory conservation and environmental protection measures otherwise within their police power"). If the plaintiffs choose to retain their Federal permits and forgo the groundfish endorsement on their State permits, and take fewer fish as a result of Federal limits on their days at sea, any such loss would be incidental to the legitimate goal of the regulation, which is to protect State fisheries from overfishing. See *White Dove, Inc.*, 380 Mass. at 478-479. See also *Davrod Corp.*, 971 F.2d at 789, quoting from *Maine* v. *Taylor*, 477 U.S. 131, 138 (1989) (issue is whether limitation imposed by State statute burdens interstate commerce only "incidentally," or whether it "affirmatively discriminates" against such commerce).

3. *Equal protection.* The regulation does not deny the plaintiffs equal protection under the Fourteenth Amendment to the United States Constitution. A rational basis test is used to determine whether an economic regulation violates the equal protection clause. *Opinion of the Justices*, 368 Mass. 831, 845 (1975), quoting from *Dandridge* v. *Williams*, 397 U.S. 471, 485 (1970)

("If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality' "). "The right 'to pursue one's business is [not] a fundamental right,' " under the equal protection clause, and the regulation "will be upheld . . . as long as it is rationally related to the furtherance of a legitimate State interest." *Route One Liquors, Inc.* v. *Secretary of Admn. & Fin.*, 439 Mass. 111, 120-121 (2003) (citations omitted). Here, the undisputed facts amply demonstrated that the regulation was enacted to address overfishing in Massachusetts coastal waters and the adverse effect of fishers taking advantage of the loophole between the Federal and the State permitting schemes to exceed conservation limits. Accordingly, the rational basis test was satisfied.

4. *Chapter 30A.* The plaintiffs claim that the regulation was illegal, arbitrary, or capricious because it exceeded the defendant's authority and failed to further the legislative mandate of maintaining, preserving, and protecting marine fisheries. Our courts have observed that the empowering provisions of G. L. c. 130, §§ 17A and 80, authorize " 'the management of the marine fisheries' in respect to '[t]he manner of taking fish[,]' [which] is a power of considerable dimension." *White Dove, Inc.*, 380 Mass. at 475-476, quoting from G. L. c. 130, § 17A. And, as the motion judge correctly noted, the enabling statute provides that the DMF is required to cooperate with "the United States of America, or any agency thereof." G. L. c. 130, § 1A, inserted by St. 2003, c. 26, § 380.

According to the summary judgment record, the regulation was adopted at the behest of the NMFS to close a loophole between the State and the Federal permitting schemes that was being used by some fishers to overfish Massachusetts waters. As "no more need be discerned than some rational relation between the regulation and the empowering statute," the plaintiffs have not shown that the regulation exceeded the defendant's statutory authority, or was arbitrary or capricious. *White Dove, Inc.*, *supra* at 477.

*Conclusion.* As we conclude that summary judgment was rightly entered for the defendant on the plaintiffs' statutory and constitutional claims, the judge properly could deny the plaintiffs'

claim for injunctive relief, and for attorney's fees under 42 U.S.C. § 1983.

*Judgment affirmed.*