E. Joel Peterson & others[1] *vs.* Commissioner of Revenue.

Suffolk. February 5, 2004. - April 6, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Taxation,* Income tax, Capital gain, Classification amendment. *Constitutional Law,* Taxation.

This court concluded that § 32 of the Revenue Enhancement Act of 2002 (Act), St. 2002, c. 186, violated art. 44 of the Amendments to the Massachusetts Constitution, which requires uniformity in rates upon incomes derived from the same class of property, because § 32 of the Act imposed different rates of taxation during the 2002 calendar year on long-term capital gains, which, as income from the sale or exchange of capital assets held for more than one year, constituted income derived from property within the meaning of art. 44. [422-429] Marshall, C.J., dissenting. Cordy, J., with whom Cowin, J., joined, dissenting.

Civil action commenced in the Supreme Judicial Court for the county of Suffolk on March 25, 2003.

The case was reported by *Sosman,* J.

*Stephen Schultz* (*Stephen M. Politi* with him) for the plaintiffs.

*Thomas A. Barnico,* Assistant Attorney General (*Amy Spector,* Assistant Attorney General, with him) for the defendant.

Spina, J. The plaintiffs (taxpayers) commenced an action in the county court, alleging that § 32 of the Revenue Enhancement Act of 2002 (Act), St. 2002, c. 186, which establishes an effective date of May 1, 2002, for the Act's provision changing the taxation rate of long-term capital gains (gains from the sale or exchange of capital assets held more than one year), violates art. 44 of the Amendments to the Massachusetts Constitution because it imposes different rates of taxation during the 2002 calendar year on income derived from the same class of

[1] Carl E. Peterson; Nautilus Motor Inn, Inc.; Cyril Gaum; Thomas Winkler, Third; Alvin Krakow; Joel Dunsky; Vangel Zissi; Nova Realty; Betty's Neck Farm Massachusetts Business Trust; Betty's Neck Farm, Inc.; Iris H. Cannata; Lisa E. Cannata; and Town and Country Realty, LLC.

property. The parties submitted a statement of agreed facts, and a single justice reserved and reported the case without decision for determination by the full court.

*Background.* Section 6 of the Act amended G. L. c. 62, § 2 (*b*) (3), to provide that "Part C gross income shall be capital gain income which equals the gains from the sale or exchange of capital assets held for more than 1 year." Section 14 of the Act amended G. L. c. 62, § 4 (*c*), to provide that "Part C taxable income shall be taxed at the same rate as provided for in paragraph (b)," referring to Part B income. General Laws c. 62, § 4 (*b*), as amended through St. 2003, c. 186, § 13, states: "Part B income [ordinary income] shall be taxed at the rate of 5.3 per cent for tax years beginning on or after January 1, 2002." Section 32 of the Act made these and other sections of the Act relating to long-term capital gains "effective for tax years beginning on or after May 1, 2002, and for the portion that begins on May 1, 2002 of any taxable year beginning on or after January 1, 2002, and before May 2, 2002."

Prior to the enactment of the Act, long-term capital gains were divided into six classes based on the length of time that the capital asset had been kept prior to sale or exchange. Capital gains taxes ranged from five per cent for capital assets held more than one year and up to two years, four per cent if held more than two years and up to three, and so on, with no tax on the gain from the sale or exchange of capital assets held more than six years. See G. L. c. 62, § 2 (*b*) (3), as amended through St. 1994, c. 195, § 10, and G. L. c. 62, § 4, as amended through St. 1994, c. 195, § 20. As a result of the enactment of the Act, long-term capital gains realized in calendar year 2002 before May 1 are taxed pursuant to the formula inserted by St. 1994, c. 195, §§ 10 and 20, whereas long-term capital gains realized in calendar year 2002 on or after May 1 are taxed as ordinary income at 5.3 per cent. After allowable deductions and adjustments, the tax rate on long-term capital gains realized on or after May 1 is higher than the tax rate on the same gain realized earlier in the year.

All the taxpayers realized income from long-term capital gains in the calendar year after May 1, 2002, and consequently they are liable for a higher tax than if the same income had

been realized in the portion of the 2002 calendar year prior to May 1.

*Discussion.* The taxpayers argue that § 32 of the Act violates art. 44[2] because it imposes different rates of taxation on income derived from the same class of property. The commissioner contends that long-term capital gain income is not income derived from property, but from unique, investor-specific factors such as business judgment, and therefore not subject to the uniformity requirement of art. 44. The commissioner argues that, even if capital gain income is subject to the uniformity requirement of art. 44, the Act does not preclude the Legislature from enacting a general rate change resulting in the application of a higher tax rate to all long-term capital gains realized after the effective date of the rate change.

"In addressing a constitutional challenge to a tax measure, we begin with the premise that the tax is endowed with a presumption of validity and is not to be found void unless its invalidity is established beyond a rational doubt." *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 235 (1982). Legislation that creates a classification of property for purposes of taxation does not violate art. 44 if there is "any reasonable ground" to support the classification or if it is not "arbitrary." *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 531 (1917), quoting *Nichols* v. *Ames*, 173 U.S. 509, 521 (1899). "A classification will not be declared void as unreasonable 'unless it was plainly and grossly oppressive and unequal, or contrary to common right.' " *Id.*, quoting *Oliver* v. *Washington Mills*, 11 Allen 268, 279 (1865). To be reasonable, the classification must reflect "actual underlying differences in the property." *Barnes* v. *State Tax Comm'n*, 363 Mass. 589, 594 (1973). Moreover, to be valid under art. 44, a classification must be based on the "sources of

[2]Article 44 of the Amendments to the Massachusetts Constitution states, in relevant part: "Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the commonwealth upon incomes derived from the same class of property. The general court may tax income not derived from property at a lower rate than income derived from property, and may grant reasonable exemptions and abatements. . . ."

income," and not the "owners of property." *Opinion of the Justices*, 266 Mass. 583, 586-587 (1929).

Both parties rely on *Tax Comm'r* v. *Putnam, supra,* as primary support for their conflicting views concerning the nature and source of capital gains income. The commissioner contends that the court in *Putnam* recognized that capital gains income did not derive from a specific class of property when it explained that "[t]he tax upon interest and dividends is levied upon a return which comes to the owner of the principal security without further effort on his part. The tax upon excess of gains over losses in the purchases and sales of intangible personal property is levied, not upon income derived from a specific property, but from the net result of the combination of several factors, including the capital investment and the exercise of good judgment and some measure of business sagacity in making purchases and sales. Gain derived in this way, to express it in 'summary and comprehensive form,' 'is the creation of capital, industry, and skill.' *Wilcox* v. *County Comm'rs*, 103 Mass. 544 (1870). It is not the production of capital alone and does not arise solely from a simple investment." *Tax Comm'r* v. *Putnam, supra* at 531. The commissioner misconstrues the point the court was making. The court was demonstrating the difference between the source of interest and dividend income on the one hand, and capital gain income on the other, and thereby explained the legislative basis for treating them as being derived from different classes of property. Contrary to the commissioner's assertion, the court did not say that the capital gain income did not derive from property, but that unlike interest and dividend income, it did not derive solely from property. The court made a similar observation in *Salhanick* v. *Commissioner of Revenue*, 391 Mass. 658, 663 (1984), when it referred to both capital gains income and interest and dividend income as derived from property, describing the former as income from "a contract for the sale of a security," and the latter as income "from the security itself" and "justifiably classified differently."

The commissioner also argues that in order for income to be "derived from property" it must be received or payable while the property is *held,* as distinguished from *sold.* Article 44 creates no such requirement and recognizes no such distinction.

The *Putnam* case specifically recognized that capital gains income, income from the *sale* or *exchange* of a capital asset, is derived from property. The court noted that capital gains income "derived from the application of sagacity to the use of capital in making purchases and resales at an advance. *The transactions could not be carried out except by the use of capital, and the profit is derived directly from the capital in combination with skill* in selecting the time for purchase and for sale" (emphasis added). *Tax Comm'r* v. *Putnam, supra* at 529. Similarly, the court in *Salhanick* v. *Commissioner of Revenue, supra,* said that "a contract for the sale of a security [a source of capital gains income] is 'property' and is justifiably classified differently from the security itself [a source of interest and dividend income]." We conclude that income from the sale or exchange of a capital asset is income derived from property within the meaning of art. 44.[3]

We turn to the taxpayers' argument that the May 1, 2002, effective date for the change in the long-term capital gains tax rate results in two separate tax rates on long-term capital gains realized in calendar year 2002, in contravention of the uniformity requirement of art. 44. The commissioner contends that art. 44 does not preclude the Legislature from enacting a general rate change resulting in the application of a higher tax rate to *all* long-term capital gain income from transactions occurring on or after the legislation's effective date, and that art. 44 is only concerned with the effect of a tax rate as it affects "similarly situated taxpayers *on any given date*" (emphasis added).

Article 44 empowers the Legislature "to impose and levy a tax on income . . . at a uniform rate throughout the commonwealth upon incomes derived from the same class of property." The components of the income tax under art. 44 are "income" and tax "rates." Under art. 44 the Legislature has the power to fix the tax rates on income derived from different

---

[3]Even if income from capital gains were not income derived from property, it is income nevertheless and it is subject to the uniformity requirement of art. 44. See *Opinion of the Justices,* 383 Mass. 940, 943 n.3 (1981) ("it is generally agreed that the requirement of uniform rates of taxation in art. 44 applies to both earned and unearned income").

classes of property and to change those rates from time to time, provided income derived from the same class of property is taxed at a uniform rate. See *Knights* v. *Treasurer & Receiver Gen.*, 237 Mass. 493, 495 (1921), aff'd sub nom. *Knights* v. *Jackson*, 260 U.S. 12 (1922). The Legislature has the power to define different classes of property from which income is derived, provided the classification is reasonable. See *Tax Comm'r* v. *Putnam, supra* at 531. The Legislature also may determine the period of time over which income will be measured for purposes of imposing the income tax. While time is not specifically referred to in art. 44, it is a component of income. Historically, in Massachusetts the tax period has been one year.[4] P. Nichols, Taxation in Massachusetts 110-111 n.1 (3d ed. 1938). The taxable year corresponds with the calendar year, unless the taxpayer has obtained permission from the commissioner to use a different fiscal year. See G. L. c. 62, §§ 1 (*h*), 62.

Article 44 does not define the term "income." The concept of income had been widely debated at the time of the adoption of the Sixteenth Amendment to the United States Constitution from 1909 to 1913, and this court has noted that that debate also informed legislators and voters at the time art. 44 was approved and ratified in 1915. See *Tax Comm'r* v. *Putnam, supra* at 528. In that case, the court said " 'income' is the amount of actual wealth which comes to a person *during a given period of time.* At any single moment a person scarcely can be said to have income. The word in most, if not all, connections involves time as an essential element in its measurement or definition. It thus is differentiated from capital or investment, which commonly means the amount of wealth which a person has on a fixed date. . . . The decisive word in the Forty-fourth Amendment is 'income.' That is a word which not only had been much discussed by legislators and in the press in connection with taxation, but which also is in everyday use. The common meanings attached to it by lexicographers, therefore, have weight in

---

[4]Section 2 of the Act provides that the definitions of long-term capital gains and losses in G. L. c. 62, § 1, shall have the meanings provided by § 1222 of the Internal Revenue Code. Title 26 U.S.C. § 1222 (7) (2000) measures all long-term capital gains and losses according to the taxable year.

determining what the people may be supposed to have thought its signification to have been when voting for the amendment. It is defined as . . . 'The amount of money coming to a person or corporation *within a specified time,* whether as payment for services, interest, or profit from investment' " (emphasis added). *Tax Comm'r* v. *Putnam, supra* at 526-527. Indeed, "[t]he relation of the income concept to *the specified time interval* is fundamental" to the taxation of income (emphasis added). H.C. Simons, Personal Income Taxation 50 (1938). See Bittker, A "Comprehensive Tax Base" as a Goal of Income Tax Reform, 80 Harv. L. Rev. 925, 961 (1967) ("Income must be measured chronologically"). Time is thus a component of income. Income, once measured by a taxable period determined by the Legislature, becomes a unit of property subject to a uniform rate of taxation. See *Opinion of the Justices,* 266 Mass. 583, 588 (1929) (power to tax income as property). As previously noted, income has always been determined annually in Massachusetts for purposes of taxation.[5] In addition, from at least 1738 until the adoption of art. 44, income in Massachusetts had been determined annually and taxed at a fixed rate. See P. Nichols, Taxation in Massachusetts, *supra.* This case asks us to decide if the uniformity requirement of art. 44 prohibits more than one tax rate from being applied to taxable income.

Unlike the "uniformity" provision of art. 1, § 8, cl. 1, of the United States Constitution, which has been construed to mean geographical uniformity, see *Billings* v. *United States,* 232 U.S. 261, 282 (1914), the meaning of "uniformity" in art. 44 is broader. "The words of [art.] 44 exact also geographical uniformity, but permit variation from *intrinsic* uniformity as to rates *only* with respect to reasonable classifications of property

---

[5]The taxpayers argue that we may weigh such factors as habitual practice, custom, or history in determining whether a statute violates art. 44. See *Opinion of the Justices,* 425 Mass. 1201, 1207 (1997); *Daley* v. *State Tax Comm'n,* 376 Mass. 861, 866 (1978). They contend that the income tax laws in Massachusetts have been amended on thirty-two occasions since the tax laws were recodified in 1971, that on no previous occasion has the Legislature ever included a provision changing the taxability of income or of the tax rate for only part of a taxable year, and that on twenty-six such occasions, provisions enacted changes affecting the entire tax year, while the other six measures were unrelated to a tax year. The commissioner does not refute this assertion.

as to sources of income . . . to the extent that income not derived from property may be taxed at a lower rate than income derived from property, and to the extent also that reasonable exemptions may be made. Thus permissible differences in rates of taxation on incomes are mentioned. Except in these particulars the tax must be 'at *a* uniform rate throughout the commonwealth' " (emphasis added). *Opinion of the Justices,* 266 Mass. at 586. Contrary to the commissioner's contention, after nearly ninety years of experience with art. 44, there can be no doubt that the tax on income must be calculated by applying a single, flat rate percentage to a particular class of income. See *Opinion of the Justices,* 383 Mass. 940, 941 (1981) ("A State income tax based on a flat rate percentage of the taxpayer's Federal income tax would result effectively in a graduated State income tax . . . [in violation of] the uniformity requirements for income taxes imposed by art. 44"); *Daley* v. *State Tax Comm'n,* 376 Mass. 861, 862 (1978) (art. 44 "commands a *single* rate of tax on income from any given 'class' of property" [emphasis added]); *Opinion of the Justices,* 266 Mass. at 586, 588 (requirement of intrinsic uniformity precludes graduated income tax).

The commissioner points out that the rate change brought about by § 32 of the Act satisfies art. 44 because it applies uniformly to all capital gain income realized after May 1, 2002. This argument fails to recognize that the tax is owed on capital gains income for the period measured by the entire 2002 calendar year. Whether different tax rates apply uniformly to different layers of income over the entire tax period, as in the case of the graduated income tax, or whether different tax rates apply to all income within different segments of the tax period, as under § 32 of the Act, the resulting tax is not "levied at a uniform rate . . . upon incomes derived from the same class of property." For purposes of the uniformity requirement of art. 44, it does not matter how much income derived from a particular class of property is received during the tax period, and it does not matter when during the tax period income is received. Income measured by a legislatively determined tax period becomes a unit of property subject to "a uniform rate" of taxation for purposes of determining the tax owed.

.

The only permissible differences in tax rates under art. 44 are those that flow from the differences in classes of property from which income is derived. If other differences had been intended, it would have been simple to express such authority in art. 44. See *Opinion of the Justices*, 266 Mass. at 586-587. The "intrinsic uniformity" of tax rates required by art. 44, *id.*, means "a single rate of tax on income from any given 'class' of property."[6] *Daley* v. *State Tax Comm'n, supra* at 862. A law that "result[s] in the imposition of different rates of taxation on income derived from the same class of property [is] in contravention of art. 44." *Salhanick* v. *Commissioner of Revenue*, 391 Mass. 658, 665 (1984).

The commissioner's contention that we must look to the rate of taxation "on any given date" blurs the distinction between income and capital, and it ignores a fundamental aspect of income, namely, the change in wealth over time. Under the commissioner's analysis the taxable year could be broken into segments having different tax rates, thereby creating a form of graduated income tax, which is prohibited by art. 44. See *Opinion of the Justices*, 383 Mass. at 941; *Opinion of the Justices*, 266 Mass. at 588. Money realized on "any given date" does not determine which rate will apply, but the year in which it will be taxed as income. See *Tax Comm'r* v. *Putnam, supra* at 536.

The commissioner's reliance on *Salhanick* v. *Commissioner of Revenue, supra,* and *Daley* v. *State Tax Comm'n, supra*, is misplaced. In the *Salhanick* case, the court held unconstitutional under art. 44 a statute that imposed different rates of taxation on royalty income paid to owners of trust certificates in an iron ore mining operation, based on whether the owners held their certificates for more than six months. The court reasoned that

---

[6]Both dissents essentially contend that the taxpayers have no constitutional right to a particular period of taxation. *Post* at 431-432 (Marshall, C.J., dissenting); *post* at 437-438 (Cordy, J., dissenting). They are correct in that limited respect. What the taxpayers are entitled to is "a uniform rate" of taxation applied to their capital gains income for the taxable period that the Legislature has set. The taxpayers do not, and need not, rely on principles of due process or equal protection, *post* at 442 (Cordy, J., dissenting), because art. 44 affords precisely the relief they seek. The period of taxation measures the income to be taxed, and it serves no other purpose. Once the income is thus determined, the tax rate is applied to the income, not the taxable period.

the tax was invalid because there was "[no] difference in kind between iron ore that is owned for one period of time and the same iron ore that is owned for another period of time." *Id.* at 664. The court held the statute unconstitutional as applied "because it resulted in the imposition of different rates of taxation on income derived from the same class of property." *Id.* at 665. Here, § 32 of the Act also results in the imposition of different rates of taxation on income derived from the same class of income.

In *Daley* v. *State Tax Comm'n, supra* at 862, 865, the court held that certain distinctions under the Internal Revenue Code for taxation of portions of lump sum payments to employees under an employer's pension plan based on when the employer made contributions to the plan, imported into the Massachusetts tax system, violated art. 44 because income from the same class of property must be taxed at a single rate.

Implicit in both the *Salhanick* and the *Daley* cases is the principle that a single tax rate must be applied to income from the same class of property received during the period specified by the Legislature for measuring income. That period in this case is calendar year 2002. Only one tax rate may be applied to all long-term capital gains realized in calendar year 2002. There cannot be, consistent with art. 44, more than one long-term capital gains tax rate on income for the taxable year 2002. We hold that § 32 of the Act violates art. 44.

We are left with the question whether the effective date of the rate change is January 1, 2002, or January 1, 2003. General Laws c. 62, § 54, states: "If any part, subdivision or section of this chapter shall be declared unconstitutional, the validity of its remaining provisions shall not be affected thereby." There is no dispute that § 14 of the Act is effective for the tax year beginning January 1, 2003. However, it is not clear that, after the May 1, 2002, effective date is struck as unconstitutional, § 14 could not possibly be effective as of January 1, 2002. The record is not sufficiently developed for a determination of this issue. We remand the case to the county court for further proceedings on the question of the applicability of § 14 of the Act as of January 1, 2002.

*So ordered.*

MARSHALL, C.J. (dissenting). Article 44 of the Amendments to the Massachusetts Constitution accords the Legislature "a considerable range of discretion within the bounds of reason" to establish classifications of taxable income. *Daley* v. *State Tax Comm'n*, 376 Mass. 861, 866 (1978). See *Opinion of the Justices*, 425 Mass. 1201, 1203 (1997). Taxpayers challenging such classifications bear the heavy burden of proving "beyond a rational doubt," *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 235 (1982), that the General Court's line drawing is "plainly and grossly oppressive and unequal, or contrary to common right." *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 531 (1917), quoting *Oliver* v. *Washington Mills*, 11 Allen 268, 279 (1865). Because in my view the plaintiffs have failed to surmount the formidable presumptions of validity that govern our review of § 32 of the Revenue Enhancement Act of 2002 (act), St. 2002, c. 186, I respectfully dissent.[1]

The act was passed to address "a serious fiscal crisis" in the Commonwealth. *Id.* In connection with this purpose, § 32 of the act established May 1, 2002, as the effective date for the replacement of a tiered system of taxation on capital gains by a uniform rate of taxation. Nothing in the plain wording of art. 44 or our case law prohibits such legislative action. Moreover, the circumstances surrounding the adoption of art. 44 in 1915 suggest no such prohibition, as Justice Cordy makes abundantly clear in his dissenting opinion.

As we have recognized, art. 44 enables the Legislature to levy taxes on a flat-rate basis on income derived from the same class of property. See *Opinion of the Justices*, 383 Mass. 940, 942 (1981), and cases cited (art. 44 gives Legislature authority to tax income while "forbidding the taxation of income from the same class of property at graduated rates, i.e., with the rate of taxation varying with the total amount of income [as, for example, is done by the Federal government]"). The uniformity requirement of art. 44 ensures that different classes of owners of

---

[1] I agree with the court's opinion that capital gains are "income . . . derived from property" within the meaning of art. 44. *Ante* at 424. See *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 526 (1917) (word "income" in art. 44 "was employed to express a comprehensive idea. It is not to be given a narrow or constricted meaning. It must be interpreted as including every item which by any reasonable understanding can fairly be regarded as income").

the same class of income-producing property will not be taxed at different rates. See *Salhanick* v. *Commissioner of Revenue,* 391 Mass. 658, 662 (1984). It also prevents the Legislature from subdividing for income tax purposes classes of property that are the same in kind. *Id.* However, art. 44 makes no mention of, and does not purport to control, the actual rate at which income derived from property may be taxed or the precise taxable event that triggers the tax levy. Those judgments, among others, are left to the Legislature's sound discretion. *Johnson* v. *Department of Revenue,* 387 Mass. 59, 67 (1982), quoting *McLaughlin* v. *Alliance Ins. Co.,* 286 U.S. 244, 250 (1932). Having exercised its constitutional authority to establish an income tax policy, the Legislature may, consistent with art. 44, "choose the moment of its realization [and recognition] and the amount realized [and recognized], for incidence and the measurement of the tax." *Johnson* v. *Department of Revenue, supra,* quoting *McLaughlin* v. *Alliance Ins. Co., supra.*

In this case, the Legislature's retroactive establishment of May 1, 2002, for the termination of one scheme of taxation on capital gains and the imposition of another might well have caused inconvenience, surprise, and expense to those who devised their tax strategies in reliance on the superseded tax scheme. But the plaintiffs have no constitutional entitlement under art. 44 to any particular income tax rate or taxable event. See *Johnson* v. *Department of Revenue, supra.* The ownership of property subject to taxation always carries with it the risk that significant features of the tax system will change over time in a manner that will increase their tax liability. Cf. *Johnson* v. *Department of Revenue, supra* at 66, quoting *Snell* v. *Commissioner,* 97 F.2d 891, 893 (5th Cir. 1938) (as to plaintiffs' equal protection claim, stating, "[t]hat the law might be changed, not only in the tax rate but in any other of its provisions, was a risk the taxpayer[s] took in deferring the [recognition] of [their] gains").[2]

That the tax provision at issue in this case took effect part

[2]In rejecting a Federal due process challenge to the Federal tax code, Judge Learned Hand made a similar point. "Nobody," he wrote, "has a vested right in the rate of taxation, which may be retroactively changed at the will of Congress at least for periods of less than twelve months . . . . The injustice is no greater than if a man chance to make a profitable sale in the months

way through the 2002 tax year does not offend the uniformity requirement of art. 44 because it does not disturb the classification of the plaintiffs' income-producing property at issue here, and it does not impermissibly divide classes of owners. Stated differently, it does *not* impose nonuniform rates on the same class of property. To be sure, as with any legislative choice of a date of enactment, different owners of a class of property necessarily will fall on one or the other side of the effective date of change, but their status as property owners and the classification of their property by type are not thereby affected. Setting a date for a uniform change in the income tax laws is an altogether different order of business from classifying income-producing property or owners of such property. The latter tasks are governed by the strictures of art. 44, but the former is not.

Contrary to the court's opinion, *Tax Comm'r* v. *Putnam, supra*, does not require a different conclusion. See *ante* at 423-424. As explained in detail by Justice Cordy, *post* at 438-441 (Cordy, J., dissenting), the *Putnam* court did not address the Legislature's authority to fix a date certain in which a new income tax rate may take effect. We should be most loathe to transform art. 44 from a specific and broadened grant of taxing authority to the Legislature into a taxpayer entitlement to a specific effective date for all changes in the income tax rate.[3] The income tax scheme established by the act was intended "to provide forthwith enhanced state revenues to assist in addressing a serious fiscal crisis." St. 2002, c. 186, preamble. That purpose is wholly consistent with the Legislature's broad constitutional powers to tax, and its duty to safeguard the public fisc. The plaintiffs' dismay at the Legislature's action, however

before the general rates are retroactively changed. Such a one may indeed complain that, could he have foreseen the increase, he would have kept the transaction unliquidated, but it will not avail him; he must be prepared for such possibilities, the system being already in operation. His is a different case from that of one who, when he takes action, has no reason to suppose than any transactions of the sort will be taxed at all." *Cohan* v. *Commissioner of Internal Revenue*, 39 F.2d 540, 545 (2d Cir. 1930).

[3]It may be that in some circumstances repeated changes in the rate of income taxation imposed part way or sequentially through a taxable period are so arbitrary and irrational as to offend art. 44. Such circumstances are not present here.

understandable, does not amount to a redressable harm within the meaning of art. 44.

CORDY, J. (dissenting, with whom Cowin, J., joins). In striking down § 32 of the Revenue Enhancement Act of 2002, St. 2002, c. 186 (§ 32), the court concludes, as a constitutional matter, that taxes on long-term capital gains income can only be assessed on an annual basis, and that the requirement that income derived from a class of property be taxed "at a uniform rate throughout the commonwealth," prohibits any change to the tax rate effective mid-year. Because I conclude that the language and history of art. 44 of the Amendments to the Massachusetts Constitution (art. 44) do not support such a restriction on the taxing power of the Legislature, and the plaintiffs have not met their formidable burden of overcoming the presumption of validity afforded to § 32, I respectfully dissent.[1]

In interpreting the meaning of art. 44, we look to construe its language "so as to accomplish a reasonable result and to achieve its dominating purpose. Its words should be interpreted in the sense most obvious to the common intelligence, because a matter proposed for public adoption must be understood by all entitled to vote." *Lincoln* v. *Secretary of the Commonwealth*, 326 Mass. 313, 317 (1950), citing *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 524 (1917). We look first to the words of the amendment, "bearing in mind that 'the Constitution "is a statement of general principles and not a specification of details." ' " *Brookline* v. *Secretary of the Commonwealth*, 417 Mass. 406, 419 (1994), quoting *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 559 (1993). The relevant language is as follows:

"Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of

---

[1]Because I would hold that § 32 of the Revenue Enhancement Act of 2002, St. 2002, c. 186, meets the constitutional requirement of uniformity, I would not reach the issue whether capital gains income is income "derived from property." See *ante* at 424.

property, but shall be levied at a *uniform rate throughout the commonwealth upon incomes derived from the same class of property.* The general court may tax income not derived from property at a lower rate than income derived from property, and may grant reasonable exemptions and abatements." (Emphasis added.)

While the amendment's words plainly articulate the principle that whatever tax rate the Legislature may set for income derived from a classification of property, the rate must be "uniform . . . throughout the commonwealth," they do not speak to whether or when the Legislature may change this "uniform rate" of taxation.

To draw further meaning from the amendment, the court must look to the "conditions under which it . . . [was] framed, the ends which it was designed to accomplish, the benefits which it was expected to confer and the evils which it was hoped to remedy." *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 526 (2000), quoting *Tax Comm'r* v. *Putnam, supra* at 524. For this purpose, I turn to the history of its ratification.

Before art. 44 was ratified in 1915, the Legislature derived its authority to levy taxes solely from the enumeration of the powers of the General Court in Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth (art. 4). That article provides that: "full power and authority are hereby given and granted to the said general court, from time to time . . . to impose and levy proportional and reasonable assessments, rates and taxes, upon all the inhabitants of, and persons resident, and estates lying, within the said Commonwealth."[2] This provision was repeatedly construed to require that municipalities (the principal collectors of taxes levied at the time) must apply a single rate of taxation to the total value of the property of all taxpayers in their respective communities, thereby ensuring that each taxpayer paid a share of the municipal burden proportional to his share of the wealth in the municipality. See *Opinion of the Justices*, 208 Mass. 616, 618 (1911). While each municipality could apply a different rate of taxation on property in its com-

---

[2]Part II, c. 1, § 1, art. 4, of the Constitution of the Commonwealth (art. 4) also gives the Legislature the power to impose "reasonable duties and excises."

munity, the rate applied was required to be uniform for all property throughout that municipality. See *id.*

Until the late 1800's, the requirements of art. 4 posed no real problems for the Legislature or municipalities: because "all the personal property of each individual was tangible and visible and kept in the town in which he dwelt . . . it was an easy matter to assess such property." P. Nichols, Taxation in Massachusetts 463 (3d ed. 1938). However, as *intangible* property (stocks, bonds, and other financial instruments) became a more common and important component of wealth, the taxation of all property at a single rate that varied from municipality to municipality posed two related problems: First, because some intangible property constituted indirect ownership of tangible property (i.e., a corporate bond of a corporation that owned real estate), taxation of the value of intangible property and taxation of the value of the underlying asset was thought to amount to double taxation. See *id.* at 463-465. Accord First Report of the Special Commission to Develop a Master Plan Relative to Constitutional Limits on the Tax Power, 1969 Senate Doc. No. 126, at 33. Second, because tax rates were different in each municipality, and the rates of the property tax in larger cities (with the greatest financial needs) were higher, "the burden of the tax on intangibles alone furnished strong motive for concealment of intangible property, and also for transfers of domicile from Boston and other cities to smaller communities having lower tax rates and less efficient assessors." *Id.* As a result of concealment and domicil shifting,[3] "hardly a fifth of the personal property in [the] commonwealth was subjected to taxation." P. Nichols, Taxation in Massachusetts, *supra* at 465.

By the early 1900's, the Legislature was actively exploring a number of alternative proposals to address the growing problems occasioned by the taxation of intangible property, including:

[3]Because intangible property was taxed at its owner's domicil, the wealthy could lower their tax burden by shifting their domicils from cities, with high tax rates and sophisticated assessors, to homes in rural communities with low tax rates and less aggressive and knowledgeable assessors. As a consequence, tax rates in the cities where resources were needed grew even higher (to make up for the lost wealth), and tax rates in rural communities moved artificially lower, magnifying the differences in municipal revenues. P. Nichols, Taxation in Massachusetts 464-465 (3d ed. 1938).

exempting some or all intangible property from the property tax and levying a Statewide special "excise" on intangible property; taxing personal property at a single rate uniform throughout the Commonwealth based on the average local tax rate; and requiring that intangible property be assessed based on the income it generated, rather than on its asset value. It sought advisory opinions from this court evaluating the constitutionality of these legislative proposals, and the court found each of them to be in excess of the taxing authority granted by art. 4. See *Opinion of the Justices*, 195 Mass. 607 (1908); *Opinion of the Justices*, 208 Mass. 616 (1911); *Opinion of the Justices*, 220 Mass. 613 (1915).

Article 44 was adopted by the Legislature and ratified by the people in this context.[4] Its adoption came "after prolonged study by successive Legislatures of the legal and practical aspects of income taxes, and after the proposal and consideration of numerous plans." *Opinion of the Justices*, 266 Mass. 583, 587-588 (1929). Among the plans considered at length but rejected was an amendment to the Constitution explicitly authorizing a graduated tax on income. See 1914 Senate J. 1613-1614. "The Legislatures of the political years 1914 and 1915 [being] not unfamiliar with taxes graded as to rates and progressively increasing in proportion to the amount of property involved," *id.* at 587, adopted language that rejected this approach.

The purpose of art. 44 was "not so much to produce additional revenue for public use, as to provide a more satisfactory system for the taxation of intangible personal property than that which had been in use since intangible property had come into existence." P. Nichols, Taxation in Massachusetts, *supra* at 463. To accomplish this purpose, art. 44 gave the Legislature greater power and flexibility to structure a system of taxation, including the power to tax *income* and the ability to set different

---

[4]Before it adopted the ultimate text of art. 44 of the Amendments to the Massachusetts Constitution (art. 44), the Legislature also considered other amendments that might solve these problems, including: amendments that would have eliminated the proportionality requirement entirely, 1914 House Doc. No. 729 and 1914 House Doc. No. 1052; and an amendment that would have authorized a single Commonwealth-wide tax rate for intangible property, 1914 House Doc. No. 1560.

rates for the taxation of income derived from different classes of property.[5] It also eliminated the requirement of proportionality for the taxation of income, requiring instead that a single rate of taxation be set for each type of income that would not vary from municipality to municipality, but would be the same throughout the Commonwealth. See, e.g., *Knights* v. *Treasurer & Receiver Gen.*, 237 Mass. 493, 495 (1921), aff'd sub nom. *Knights* v. *Jackson*, 260 U.S. 12 (1922) ("Under this amendment plainly income taxes are not required to be proportional or equal as between different validly established classes. They need only be reasonable and uniform . . .").

Consistent with its "dominant purpose" and its historical context, it is apparent that the use of the word "uniform" in art. 44 was intended to ensure that whatever tax rate was to apply to each classification of income, it be a flat (rather than graduated) rate that would apply across the Commonwealth. *Opinion of the Justices*, 266 Mass. 583, 586 (1929) (art. 44 exacts geographic uniformity and does not permit different rates based on differences in amounts of income received by taxpayers). There is no suggestion, discussion, or implication in the history of its adoption that art. 44 was intended to control the timing of the setting of the tax rate or the length of the period during which any particular rate would apply. The court, however, reads a far broader meaning into the term "uniform," one that restricts the date on which the Legislature is authorized to change the "tax rate." *Ante* at 426-428. This meaning is neither apparent from the amendment's words nor necessary to achieving its purpose.

The "uniform rate" requirement does not prevent the Legislature from changing the rate of taxation on income derived from a class of property: "It cannot be doubted that

[5]In the year following the amendment, the Legislature enacted the first income tax law. It "was intended to enable the state to impose a tax on intangible securities which was capable of enforcement with some degree of equality and without driving capital out of the state. So far as it applied to income from property it affected only the classes of intangible property which were previously taxable on their capital value at the local rate, and as to such property it reduced the tax from a variable local rate, which amounted frequently to from 30 to 50 per cent of the income, to a fixed rate of 6 per cent, but provided means for the strict and impartial enforcement of the tax." P. Nichols, Taxation in Massachusetts, *supra* at 467.

[art. 44] confers power to change the rate of the tax from time to time as the public welfare may require," *Knights* v. *Treasurer & Receiver Gen.*, *supra* at 495. Similarly, the Legislature should have broad discretion to determine the effective date of a tax. Cf. *Johnson* v. *Department of Revenue*, 387 Mass. 59, 67 (1982), quoting *McLaughlin* v. *Alliance Ins. Co.*, 286 U.S. 244, 250 (1932) ("[The Legislature], having constitutional power to tax the gain . . . may choose the moment of its realization [and recognition] and the amount realized [and recognized], for the incidence and the measurement of the tax"). But the court now reasons that any new rate must apply to an entire year, because "[t]ime is . . . a component of income" and "income has always been determined annually in Massachusetts for purposes of taxation." *Ante* at 426. It reaches this conclusion relying on language in *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 526-527 (1917). *Ante* at 425-426. But the *Putnam* case does not mandate so restrictive a definition of income and does not incorporate any particular measure of it into the Constitution.

The *Putnam* case involved a challenge to the first income tax statute enacted after art. 44 was ratified, the Income Tax Act of 1916, St. 1916, c. 269. The defendant in that case alleged that the act violated art. 44, because it authorized the taxation of "gains over losses in the purchase and sales of intangible personal property by one not engaged in the business of dealing in such property" — i.e., capital gains. *Id.* at 524. The challenge involved two contentions: (1) that such capital gains were not "income" and could not constitutionally be reached by the taxing power, and (2) even if capital gains could be taxed, the income tax law unconstitutionally taxed them at a different rate (three per cent) than it taxed income from stock dividends and bond interest (six per cent). See *id.* at 528-531. The court upheld the law, holding first that, in art. 44, "the word 'income' . . . was employed to express a comprehensive idea. It is not to be given a narrow or constricted meaning. It must be interpreted as including every item which by any reasonable understanding can fairly be regarded as income." *Id.* at 525-526. Thus, "income" included capital gains. Then, noting that earning income from capital gains requires significant effort on the part of the investor, while earning income from stock dividends and

bond interest is essentially a passive activity, the court concluded that capital gains and income from stock dividend and bond interest "do not belong to the same class" and could therefore be taxed at different rates. *Id.* at 531.

The *Putnam* case's broad interpretation of "income" is consistent with the general purpose of art. 44, namely, to grant the Legislature increased flexibility in taxing and setting rates of taxation for income derived from different classes of property. The language from the *Putnam* case on which the court relies for its conclusion in the present case was not intended to restrict that legislative flexibility; rather it comes from a general and prefatory discussion early on in the opinion involving the conceptual distinction between "income" and "wealth":

> "At any single moment a person scarcely can be said to *have* income. The word in most, if not all, connections involves time as an essential element in its measurement or definition. It thus is differentiated from capital or investment, which commonly means the amount of wealth which a person *has* n a fixed date. Income may be *derived* from capital invested or in use, from labor, from the exercise of skill, ingenuity, or sound judgment, or from a combination of any or all of these factors." (Emphasis added.) *Id.* at 526.

The court goes on further to describe income as synonymous with " 'gain,' 'profit,' 'revenue.' "[6] *Id.* at 527. While it may be that income, as compared to wealth, cannot be meaningfully

---

[6]While it may be more meaningful for some purposes to say that a person *has* wealth rather than income at any single moment in time, a person *acquires* — or, in the words of *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 527 (1917), "derive[s]" — income ("gains," "profit," or "revenue") at specific moments in time. And the moment of receipt of income is a very important demarcation point in our tax laws. Tax liability for income "arises when the income passes into the hands of the person beneficially entitled to it." *Hart* v. *Tax Comm'r*, 240 Mass. 37, 39 (1921) (invalidating tax on income that taxpayer acquired before moving into Massachusetts). Thus, for example, tax liability for a paycheck received on January 2, 2004, for work done in December, 2003, is taxed at the rate effective January 2, 2004 — the moment at which the income was received — not at the rate effective in December, 2003 — the time over which the income was earned. See 26 C.F.R. § 1.446-1(c)(i) (2003) ("under the cash receipts and disbursements method in the computation of taxable income, all items which constitute gross income [whether in the form of cash,

captured in a single snapshot of financial condition, and that as a practical matter its measurement requires an element of time, the duration of that period of time is not a question of constitutional dimension. It is whatever the Legislature, by statute, says it is.

The language in *Tax Comm'r* v. *Putnam, supra* at 530, tying "income as ascertained for tax purposes" to the calendar year is not to the contrary. What that language describes is taxable income as calculated under the income tax act of 1916 — the act that *Putnam* was interpreting:

> "*The Income Tax Act, according to the express provisions of section 7* and *as interpreted by the commissioner in its application to these defendants*, is to be levied only on such increases in values as have been realized by sales within the year, using as the basis of value in instances where stock was owned by the taxpayer on January 1, 1916, the fair cash value at that time. Thus the income as ascertained for tax purposes is the annual income in its strict sense. It is a direct apportionment of the increment from this source to the year in which it was received and converted into cash." (Emphasis added.)

*Tax Comm'r* v. *Putnam, supra* at 529-530. The significance of this language does not relate to the one-year period it references, but to a different constitutional concern present in the *Putnam* case, but not here. That concern arose from the historical fact that the 1916 statute was the State's first income tax statute. In an effort to ensure that the income tax was not unconstitutionally imposed on appreciation in asset value accruing prior to the effective date of the tax, the statute set new basis values for all assets as of January 1, 1916. Thus, the court emphasized that the tax imposed on gains from asset sales made during the 1916 tax period was only being imposed on gains attributable to the increased value of those assets accruing after January 1, 1916.[7] Nothing in *Putnam* suggests that its discussion of taxable income under the 1916 act was intended to limit

---

property, or services] are to be included for the taxable year in which actually or constructively received"). Taxpayers are subject to tax liability on income as of the date that they receive it, and at the rate that is in effect at that time.

[7] The concern over the constitutionality under art. 44 of measuring gain on the sale of an asset with reference to a basis prior to the applicability of a tax

the meaning or measure of "income" under art. 44, or under any subsequent tax statute, to any particular period of time. The length of the income measuring or tax period could have been six months or three months, had the Legislature so chosen, rather than the one year period it specifically included in the 1916 statute.

The present case does not involve the income tax act of 1916; it involves the Revenue Enhancement Act of 2002. That act explicitly taxes long-term capital gains income at a different rate during two different periods within a calendar year. The taxpayer is required to total up all long-term capital gains and losses incurred during the period from January 1, 2002, through April 30, 2002, and apply one tax rate to any resultant net income, and to perform the same task for all such gains and losses incurred during the period from May 1, 2002, through December 31, 2002, and apply a different tax rate. Contrary to the argument of the plaintiffs, this does not improperly treat long-term capital gains as different "classes" of property depending on when the gain was realized (i.e., before May 1, 2002, or thereafter), no more than capital gains received on December 31 of one year would be viewed as being treated as a different class of property from those received on January 1 of the following year, if a different tax rate applied to them. The relevant constitutional inquiry is not the difference in tax rates applicable to capital gains income made effective by a legislative enactment, but whether income earned after the enactment's effective date is taxed uniformly. Here, the act imposes one uniform rate — 5.3 per cent — on all long-term capital gains income realized during the period from May 1, 2002, through December 31, 2002. St. 2002, c. 186, § 13.

In sum, I reject the court's reading of the limited definition of "income" as change in wealth over a calendar year into the art. 44 requirement that income be taxed at a "uniform rate throughout the commonwealth." The element of time in the calculation of income is a matter of statutory rather than constitutional concern. Here the Legislature has chosen to measure and tax long-term capital gains income at periods less

was finally put to rest in *Johnson* v. *Department of Revenue*, 387 Mass. 59, 67 (1982).

than one year. The uniformity provision of art. 44 requires merely that all income similarly derived and received during the same measuring period (however narrowly defined by statute) be taxed at the same flat rate across the Commonwealth. Because § 32 plainly meets this requirement, it is in conformance with art. 44.[8]

In rejecting the commissioner's contention that the "uniform rate" provision requires only that the rate of taxation for a class of property be identical on any date on which the tax is imposed, the court voices the concern that under this view "the taxable year could be broken into segments having different tax rates, thereby creating a form of graduated income tax, which is prohibited by art. 44." *Ante* at 428. The plaintiffs raised a similar concern, claiming that the authority to change the tax rate mid-year would permit the Legislature to research the dates on which the wealthiest individuals acquired income, and then impose a temporary higher tax on those dates (presumably retroactively), to create the effect of a graduated income tax. While these concerns may be legitimate, they are misdirected: principles of due process and equal protection — not the uniformity clause — prevent the potential abuses that trouble the court and the plaintiffs. No such abuses are presented to us in this case.

I would hold that the plaintiffs have not met their heavy burden of proving "beyond a rational doubt" that § 32 of the Revenue Enhancement Act of 2002 violates art. 44 of the Amendments to the Massachusetts Constitution. *Andover Sav. Bank* v. *Commissioner of Revenue*, 387 Mass. 229, 235 (1982).

---

[8]The court's opinion concedes that there is no constitutional right to a particular period of taxation (see *ante* at 428 n.6), and that the tax rate can change between periods of taxation. It concludes, however, that § 32 violates art. 44 because it changes the "tax rate" while maintaining the same "period of taxation." This distinction is not meaningful either as a practical or as a constitutional matter. By changing the tax rate in effect on income earned during the period from May 1, 2002, through December 31, 2002, § 32, defines (or changes) the period of time during which income will be measured for purposes of imposing the tax.